1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name    PALACIOS      EDWARD

3    _____(Last)_____(First)_____(Initial)_____

4    Prisoner Number   D-27035

     Institutional Address ____Correctional Training Facility_____

5    _____P.O. Box 689, Soledad, Ca 93960_____

6    ═══════════════════════════════════════

7    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF CALIFORNIA

8    EDWARD PALACIOS,

9    (Enter the full name of plaintiff in this action.)

10                    vs.                                Case No. _____
                                                        (To be provided by the clerk of court)
11   ARNOLD SCHWARZENEGGER, Governor

12   of California,                                     PETITION FOR A WRIT
                                                        OF HABEAS CORPUS
13   XXXXXXXXXX

14   _____

     (Enter the full name of respondent(s) or jailer in this action)

15

16   ═══════════════════════════════════════

     **Read Comments Carefully Before Filling In**

17   Underline When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19   counties:  Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located.  If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined.  Habeas L.R. 2254-3(b).

     PET. FOR WRIT OF HAB. CORPUS          - 1 -

1  <u>Who to Name as Respondent</u>

2         You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11         1. What sentence are you challenging in this petition?

12                (a)    Name and location of court that imposed sentence (for example; Alameda

13                       County Superior Court, Oakland):

14  Los Angeles County Superior Court    Los Angeles

15                       Court                              Location

16                (b)    Case number, if known  A-772 728

17                (c)    Date and terms of sentence  3/21/1986 - 15 years to life

18                (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                       parole or probation, etc.)        Yes XX    No _____

20                       Where?

21                       Name of Institution: Correctional Training Facility

22                       Address: P.O. Box 689, Soledad, CA 93960

23         2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Second degree murder, Penal Code § 187

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

    Arraignment:                Yes _____     No _____

    Preliminary Hearing:       Yes _____     No _____

    Motion to Suppress:        Yes _____     No _____

4. How did you plead?

    Guilty _____    Not Guilty _____    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury _____    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?           Yes _____     No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment             Yes _____     No _____

    (b)    Preliminary hearing      Yes _____     No _____

    (c)    Time of plea             Yes _____     No _____

    (d)    Trial                   Yes _____     No _____

    (e)    Sentencing             Yes _____     No _____

    (f)    Appeal                Yes _____     No _____

    (g)    Other post-conviction proceeding    Yes _____     No _____

8. Did you appeal your conviction?         Yes _____     No _____

    (a)    If you did, to what court(s) did you appeal?

    Court of Appeal              Yes _____     No _____

    Year: _____    Result:_____

    Supreme Court of California     Yes _____     No _____

    Year: _____    Result:_____

    Any other court              Yes _____     No _____

    Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

_N. A. PAROLE HEARING_

PET. FOR WRIT OF HAB. CORPUS    - 3 -

petition?                                          Yes _____    No_____

   (c)   Was there an opinion?                    Yes _____    No_____

   (d)   Did you seek permission to file a late appeal under Rule 31(a)?

                                                          Yes _____    No_____

        If you did, give the name of the court and the result:

_____

_____

9.  Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?                    Yes XX    No_____

[Note:  If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition.  You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28 U.S.C. §§ 2244(b).]

   (a)   If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding.  Attach extra paper if you need more space.

        I.   Name of Court:  Los Angeles County Superior Court

            Type of Proceeding:  Habeas corpus

            Grounds raised (Be brief but specific):

            a.  SAME AS RAISED HEREIN _____

            b._____

            c._____

            d._____

            Result:  Denied _____Date of Result: 0/22/2007

        II.   Name of Court:  Calif. App. Ct., Second App. Dist.

            Type of Proceeding:  Habeas corpus

            Grounds raised (Be brief but specific):

a. _SAME AS RAISED HEREIN_____

b. _____

c. _____

d. _____

Result: __Denied_____ Date of Result: _9/13/2007_

III.  Name of Court: _California Supreme Court_____

Type of Proceeding: _Habeas Corpus_____

Grounds raised (Be brief but specific):

a. _SAME AS RAISED HEREIN_____

b. _____

c. _____

d. _____

Result: __Denied_____ Date of Result: _3/19/2008_

IV.  Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No _____

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

need more space.  Answer the same questions for each claim.

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION WHEN THE GOVERNOR REVERSED
PETITIONER'S GRANT OF PAROLE SUITABILITY BASED ON THE
COMMITMENT OFFENSE OVER TWO DECADES IN THE PAST WHEN
THERE IS NO EVIDENCE OR RATIONAL CONNECTION BETWEEN THE
COMMITMENT OFFENSE BALANCED AGAINST PETITIONER'S
REHABILITATION AND <u>CURRENT</u> THREAT TO PUBLIC SAFETY.

---

## Supporting facts

On January 6, 1986, the District Attorney of Los Angeles County
filed an information against Petitioner charging him with one count
of second degree murder (EXHIBIT 1 [Petitioner, "on or about the
2nd day of September 1985, at and in the County of Los Angeles, State
of California, did willfully and unlawfully, and with malice
aforethought murder EDDY ANGULO, a human being"]).

On March 21, 1986, Petitioner did enter into a contract with
the State of California, through the District Attorney's Office of
Los Angeles County, pleading guilty as charged (EXHIBIT 2).  As stated
by the trial judge, the Honorable Alexander H. Williams, III: "I
am satisfied that this case is a case that is a second degree case"
(EXHIBIT 2, p. 2:8-9).  The prosecution made clear, "the people could
not prove beyond a reasonable doubt the elements of premeditation
and deliberation necessary for a first degree murder conviction.
That a second degree murder conviction and the plea in this matter
is appropriate, especially in light of the defendant's background,
which...is void of any convictions" (EXHIBIT 2, p. 4:4-10).  Any
"undetermined enhancement allegations and the balance of the counts,
if any" were "dismissed."

Petitioner pled guilty to one count of second degree murder in violation of Penal Code § 187[1/] and sentenced to an indeterminate sentence of 15 years to life pursuant to Penal Code § 190.

A fairly accurate description of the commitment offense is found in Petitioner's Probation Officer's Report (hereafter POR) (EXHIBIT 3, p. 2):

> "At approximately 1:40 a.m. on September 2, 1985, while 17-year-old Eddy Angulo was at Lennox Park with his girlfriend and other acquaintances, a truck driven by Edward Palacios approached Angulo.  This truck also contained Carlos Soto and 14-year old Robert Sanden as passangers.  Someone in the truck asked Mr. Angulo where he was from and once he stated--Lennox, a verbal confrontation developed with the occupants of the truck eventually exiting the vehicle and approaching Mr. Angulo.  Robert Sanden used a baseball bat to strike the victim while Carlos Soto also used a baseball bat to strike the victim.  Edward Palacios used a knife to stab the victim.  After the stabbing, the assailants returned to their vehicle and drove off."

Eddy Angulo died seven days later, on September 9, 1985, "due to a stab would penetrating the heart and cutting the right coronary artery"; it was determined that the victim "sustained six separate stab wounds to his chest and abdomen" (EXHIBIT 3, pp. 2-3).

On August 3, 2005, two decades after the commitment offense, the Board of Parole Hearings (hereafter Board) after a through review of the commitment offense, weighed against time and Petitioner's excellent rehabilitation (EXHIBIT 4, HT 9-64)[2/] found Petitioner suitable for parole (EXHIBIT 4, HT 65-71).  In short, the Board based its decision on the following (EXHIBIT 4, HT 66-71):

> "The panel has reviewed all of the information received from the public and relied on the information and following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." Petitioner "has no juvenile record of assaulting others...enhanced his ability to function within the law upon release...he's a certified optician, completed graphic arts/offset

---

1. All statutes and regulations are California, unless otherwise noted.

2. References to parole hearing transcript, EXHIBIT 4, will be noted by HT followed by page number, e.g., (HT 1).

printing program...(many self-help groups/programs)...lacks a significant history of violent crime. The only violent crime you committed, sir, was the violent crime you're here for...you have no adult crimes and this was it...maturation, growth, greater understanding and advance age he has reduced his probability of recidivism. Twenty years in custody, no violence...has realistic parole plans, family support and market skills...maintained close family ties while in prison."

Most important relevant to suitability and not posing a current threat to public safety after two decades, being disciplinary free, receiving only one CDC 128 counseling chrono (EXHIBIT 4, HT 69), Petitioner is suitable for parole because (HT 70): "He shows signs of remorse, he has indicated that he understands the nature and magnitude of the offense and accepts responsibility for his criminal behavior and has a desire to change toward good citizenship. I think even though you stated to the Board you have remorse, it is also indicated in your psychiatric reports consistently." And, referring to Petitioner's history of consistent psychological evaluations by the Board's forensic experts (HT 71): "I don't put a lot of weight on psychs unless they're consistent. They have been consistent and positive up until the recent psych they just brought to us. (EXHIBIT 5.) Your personal growth and vocational growth while you've been here is all positive. It's all been in the same direction. There haven't been any skips, there hasn't been any -- You haven't fallen down to have to pick yourself up and start over again. You've got 20 years of positive, continuing growth...."

The Board calculated Petitioner's base term in accord with the legislatively prescribed matrix as a measurement for uniform punishment for similar offenses committed under similar circumstances (California Code of Regulations, Title 15, § 2403(c)) (HT 71-72). Petitioner's offense was placed in category C-III, no prior relationship with the victim and death resulted from severe trauma

inflicted with deadly intensity, multiple stab wounds not resulting in immediate death. Petitioner's base term was set at 240 months, or 20 years (EXHIBIT 6). Petitioner was then accredited 72 months, or 6 years, for his exemplary behavior and rehabilitative gains, bringing his net term to 168 months, or 13 years 8 months, placing Petitioner 6 years 4 months past his legislatively prescribed uniform punishment for his commitment offense.

As indicated, playing a major role in the Board's decision, is the consistency of Petitioner's psychological evaluations, culminating in the evaluation dated June 9, 2005 (EXHIBIT 5). It was Dr. Steward's expert opinion that Petitioner "has excellent insight into his committing offense, and genuinely regrets the death of the victim, who he referred to as 'Eddie.' .... Inmate Palacios has very good judgment and very good impulse control. This truly does not appear to be the same man who was incarcerated 20 years ago" (EXHIBIT 5, pp. 2-3). "If released to the community, inmate Palacios' dangerousness is considered to be average to below average relative to the average citizen (EXHIBIT 5, p. 4). Dr. Steward concludes: "After 20 years of incarceration, this self-motivated, mature, 40-year-old man appears to have a high likelihood of success" (EXHIBIT 5, p. 5).

After passing the Decision Review Unit, the decision that Petitioner is suitable for parole and therefore not a current threat to public safety, on December 19, 2005, Governor Arnold Schwarzenegger reversed the Board's 2005 decision finding Petitioner suitable for parole (EXHIBIT 7). The sole reason the Governor relied on to reverse Petitioner's suitability for parole was the commitment offense.

The Governor describes the murder of Eddie Angulo as stated in the POR, cited above, then finds: "Mr. Palacios committed an especially cruel second-degree murder and this factor alone is enough for me to conclude presently that his release from prison would pose an unreasonable public-safety risk" (EXHIBIT 7, p. 2). The Governor concluded (EXHIBIT 7, p. 2):

> "Mr. Palacios has been in prison a long time and has made credible gains over the years, including claiming responsibility and remorsefulness for Mr. Angulo's murder. But after carefully considering the very same factors the Board is required to consider, I find the gravity of the second-degree committed by Mr. Palacios presently outweighs the positive factors supporting his parole suitability. Accordingly, because I believe his release from prison would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2005 decision to grant parole to Mr. Palacios."

On March 3, 2006, Petitioner filed a writ of habeas corpus in the Superior Court of California, County of Los Angeles. Nearly sixteen (16) months later, on June 22, 2007, the writ was denied (EXHIBIT 8). Petitioner is somewhat confused by the trial court's denial because the court cites a reason not given by the Governor. The Governor stated, "This was a vicious, unprovoked, gang-related murder...and demonstrative of exceptional depravity, cruelness, and disregard for human life and suffering. [] Mr. Palacios committed an especially cruel second-degree murder and this factor alone is enough for me to conclude..." (EXHIBIT 7).

Turning to the trial court's decision: "The Court finds that there is some evidence to support the Governor's finding that 'the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.' (Cal. Code Regs., tit. 15, § 2402(c)(1)(D))" (EXHIBIT 8, p. 1). The court explains, "Callous disregard for human suffering is demonstrated when 'death results from severe trauma inflicted with deadly

intensity; e.g., beating, clubbing, stabbing, strangulation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim" (Id.).

Although the Govenor said nothing in his decision about "motive"; not even addressing motive as it relates to the regulations (Cal. Code Regs., tit. 15, § 2402(c)(1)(E)), the state court concluding: "The Governor was justified in determining that this motive is materially less significant than those which conventionally drive people to commit murder, indicating that petitioner is more of a risk to society if released" (Id., p. 2).  The Governor, in his decision, never uses the word "motive" much less finding "the motive for the crime is inexplicable and very trivial in relation to the offense" as the state court quotes, the state court decision be unreasonable in light of the facts.

The Los Angeles County Superior Court decision was affirmed by the Appellate Court of California, Second Appellate District, on September 13, 2007 (EXHIBIT 9); and the California Supreme Court denied review on March 19, 2008 (EXHIBIT 10).


* * * * * * *


If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

No new grounds are presented.

1   List, by name and citation only, any cases that you think are close factually to yours so that they

2   are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3   of these cases:

4   _____PLEASE SEE MEMORANDUM OF LAW ATTACHED HERETO_____

5   _____

6   _____

7   Do you have an attorney for this petition?                    Yes_____     No_xx_

8   If you do, give the name and address of your attorney:

9   _____

10   WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on __4·13·08_____          _____

14                     Date                                              Edward Palacios
                                                                  Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          -- 12 --

<u>M E M O R A N D U M   O F   L A W</u>

A.  <u>Petitioner has A Liberty Interest in Parole</u>

Under California's parole statutes, Penal Code § 3041(b),
Petitioner has a liberty interest in parole (<u>Greenholtz v. Inmates
of Nebraska Penal and Correctional Complex</u> (hereafter <u>Greenholtz</u>),
442 U.S. 1 (1979); <u>Sass v. Board of Prison Terms</u>, 461 F.3d 1123,
1127 (9th Cir. 2006).

The Governor of California reversed Petitioner's grant of parole
on December 19, 2005, the "predicate act" (28 U.S.C. § 2244(d)(1)(D)).
Sixty-two days later, on March 3, 2006, Petitioner filed a writ of
habeas corpus in the Superior Court of California, Los Angeles County,
challenging the Governor's decision.  The writ being denied 476 days
later on June 22, 2006, Petitioner being served on July 13, 2007,
tolling therefore being 497 days (EXHIBIT 8).  Fifty-four days later,
on or about September 5, 2007 Petitioner filed a writ of habeas corpus
in the Appellate Court of California, Second Appellate District.
The writ was denied on September 13, 2007 (EXHIBIT 9).  On or about
January 15, 2008, 143 days later, Petitioner filed a writ in the
California Supreme Court.  On March 19, 2008, 54 days later, the
writ was denied (EXHIBIT 10).

In total, from December 19, 2005, when the "predicate act"
occurred, until the writ was denied by the California Supreme Court,
a total of 497 days are tolled; and, as of April 10, 2008, a total
of 272 days are untolled (28 U.S.C. § 2244(b)(2)), leaving Petitioner,
as of April 10, 2008, with a reserve of approximately 93 days.

Petitioner having a "liberty interest" in parole, being diligent
in exhausting his state court remedies, this Court has jurisdiction.

B.   **After 20 Plus Years Into A 15 Years to Life Sentence, There Is No Evidence Petitioner Is A CURRENT Threat to the Public.**

Currently, the most persuasive, and instructive authority on some evidence and how it is to be applied and weighed is the recent decision from the Ninth Circuit Court of Appeals in the precedent setting case of <u>Hayward v. Marshall</u>, 512 F.3d 536, (9th Cir. 2008). Relying on <u>In re Lee</u>, 143 Cal.App.4th,1400 (2006); <u>In re Elkins</u>, 144 Cal.App.4th 475 (2006); and <u>In re Scott II</u>, 133 Cal.App.4th 573 (2005) (see <u>Ryman v. Sears and Robuck</u>, 505 F.3d 993, 995 (9th Cir. 2007) ["where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts"] internal quotation marks omitted), analyzing California's parole law, reviewing federal constitutional protections of the "some evidence" standard under the application of California law, the Ninth Circuit Court of Appeals concluded the suitability and unsuitability factors set out in Cal. Code Regs., tit. 15, § 2402(c) and (d), in <u>Hayward v. Marshall</u>, 512 F.3d, at 543, <u>supra</u>:

"Even though these suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made it clear that the 'findings that are necessary to deem a prisoner unsuitable for parole,' <u>Irons</u> [v. Carey], 505 F.3d [846,] at 851 [(9th Cir. 2007)], 2007 WL 2927359, at *3, are not that a particular factor or factors indicating unsuitability exists, but that a prisoner's release will unreasonably endanger public safety. (Citations.); see Cal. Penal Code § 3041(b) (providing that the Board 'shall set a release date unless...consideration of the public safety requires a more lengthy period of incarceration for this individual'). For our purposes, then, '[t]he test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.' <u>Lee</u>, 143 Cal. App.4th at 1408 (citations and footnotes omitted); see also <u>In re Elkins</u>, 144 Cal.App.4th 475, 499, 50 Cal.Rptr.3d 503 (Cal. Ct. App. 2006) (<u>holding that the 'governor, in reviewing a suitability determination, must remain focused...on facts indicating that release currently poses 'an unreasonable risk of danger to society'"</u> (citing Cal. Code Regs. tit. 15, § 2402(a)); <u>Scott</u>, 133 Cal.App.4th at 591 ('<u>The factor</u>

statutorily required to be considered and the overarching consideration, is "'public safety.'" (citing Cal. Penal Code § 3041(b))" (emphasis and ellipses in original).

While it may be argued that Hayward v. Marshall is only "dicta," that dicta is instructive authority in the Ninth Circuit.  That instruction being that parole suitability turns on two factors: (1) time, has the prisoner served his minimum term?; and (2) rehabilitation, is there any evidence that the prisoner is not rehabilitated and would therefore be a current threat to society? (McCarns v. Dexter, ___ F.Supp.2d ___, (C.D. Cal. 2008), 2008 WL 360827, *13, factual predicate is satisfied when prisoner has served minimum term; legal predicate is satisfied when prisoner is rehabilitated.  See also In re Tripp, 150 Cal.App.4th 306, 313 (2007) ["It violates a prisoner's right to due process when the Board or Governor attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion".]

In that Petitioner's commitment offense will never change, as articulated by the United States Supreme Court: "The decision turns on...primarily what a man is and what he may become rather than simply what he has done" (Greenholtz, 442 U.S., at 10, supra); moreover, "[i]t is important that we not overlook the ultimate purpose of parole which is a component of the long-range objective of rehabilitation" (Id., at 13).  Thus, "[t]he behavior record of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release" (Id., at 15).  The Supreme Court also recognized that a prisoner "may become eligible for discretionary parole when the minimum term, less good time credits, has been served" (Id., at 4).  The factual predicate,

therefore, is time; while the legal predicate is rehabilitation. Rehabilitation, of course, being the ultimate determining factor. This is the Greenholtz doctrine: time, plus rehabilitation, equal parole.  Twenty years after the commitment offense

Petitioner satisfied his minimum term on February 19, 1995 (see EXHIBIT 4, HT 1:14-15, "minimum eligible parole date"), calendar years plus custody credits.  Petitioner met his 15 calendar years on or about September 25, 2000.  Calculating Petitioner term, applying earned conduct credits, Petitioner's net term is 168 months, or 11 years months 8 months (EXHIBIT 6).  Thus, Petitioner is currently 10 plus years beyond his release date.

The Governor's decision in case at bench is based solely on the commitment offense (EXHIBIT 7, p. 2).  The state court decision (EXHIBIT 8), affirmed by the state Appellate Court (EXHIBIT 9), and California Supreme Court (EXHIBIT 10), are unreasonable in light of the facts and unsupported by any evidence that Petitioner is a current threat to the public, violating his right to due process.

The Ninth Circuit warned: "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from relevant California statutes" (Irons v. Carey, 505 F.3d 846, 854 (9th Cir. 2007); Hayward v. Marshall, 512 F.3d, at 545, supra).  While the Governor's "reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can initially be justified as fulfilling the requirements of state law[,] [¶] "[a] continued reliance in the future on an unchanging factor, the circumstance

of the offense and prior criminal history, runs contrary to the
rehabilitative goals espoused by the prison system and could result
in a due process violation" (Biggs v. Terhune, 334 F.3d 910, 916-917
(9th Cir. 2003); In re Roderick, 154 Cal.App.4th 242, 264 (2007)
[a rational connection must be made between the commitment offense
20 years ago and statutory basis for denial-current threat to public
safety]; In re Tripp, 150 Cal.App.4th, at 309 ["the viciousness of
the commitment offense must be balanced against the passage of time
and rehabilitation"]).  Thus, after exceeding the minimum term of
the sentence, satisfying the factual predicate, suitability turns
on the legal predicate, rehabilitation (McCarns v. Dexter, 2008 WL
360827, *13, supra).  Unquestionably, Petitioner has satisfied both
prongs and any further imprisonment serves no legitimate penological
interest.

### C O N C L U S I O N

It is respectfully requested that the Court issue an ORDER for
the respondent to show cause why the writ should not be granted;
and, in that Petitioner has exceeded his uniform term for the gravity
of his commitment offense and its threat to public safety by 8 plus
years, why all excess credits should not be applied to his period
of parole (Martin v. Marshall, 448 F.Supp.2d 1143, 1145 (N.D. Cal.
2006); Cal. Code Regs., tit. 15, § 2345).

DATED: 4-13-08

Respectfully submitted,

Edward Palacios
Petitioner in pro se

- 17 -

EXHIBIT 1

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# FOR THE COUNTY OF LOS ANGELES

The People of the State of California,

Plaintiff,

v.

EDWARD PALACIOS, and
CARLOS SOTO

Defendant.

No. A 772728

AMENDED

**INFORMATION**

VIOL. SEC. 187(a) PC  CT. I

The said   EDWARD PALACIOS, and
CARLOS SOTO

is accused by the District Attorney of and for the County of Los Angeles, State of California, by this information, of the crime of   MURDER, in violation of Penal Code Section 187(a),

a felony, committed as follows: That the said   EDWARD PALACIOS, and
CARLOS SOTO

on or about the   2nd   day of   September 1985   , at and in the County of Los Angeles, State of California, did willfully and unlawfully, and with malice aforethought murder EDDY ANGULO, a human being.

It is further alleged that in the commission and attempted commission of the above offense, the said defendant(s), EDWARD PALACIOS, personally used a deadly and dangerous weapon(s), to wit, KNIFE, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(

It is further alleged that in the commission and attempted commission of the above offense, the said defendant(s), CARLOS SOTO, personally used a deadly and dangerous weapon(s), to wit, BASEBALL BAT, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(b).

Filed in open Superior Court of the State of California, County of Los Angeles, on motion of the District Attorney of said County.

DATED:

**FILED**

JAN 06 1986

JOHN J. CORCORAN, Clerk

COUNTY CLERK

By _____ By _____ Deputy

IRA REINER

~~JOHN K. VAN DE KAMP~~, District Attorney

for the County of Los Angeles, State of California

By _____ Deputy

PAUL TAKAKJIAN

em

761550A2—Rev. 7-77—10/80

EXHIBIT 2

46

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NO. 112      HON. ALEXANDER H. WILLIAMS, III, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                        )
                         PLAINTIFF, )    NO. A-772 728
                                        )
         VS.                            )    STATE PRISON
                                        )
EDWARD PALACIOS,                        )
                                        )
                         DEFENDANT. )
                                        )
───────────────────────────────────────

LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 21, 1986; 10:30 A. M.


         UPON THE ABOVE DATE, THE DEFENDANT BEING

PRESENT IN COURT WITH COUNSEL, LINDSEY WESTON, DEPUTY PUBLIC

DEFENDER OF LOS ANGELES COUNTY; THE PEOPLE BEING REPRESENTED

BY PATRICK DIXON, FOR PAUL TAKAKJIAN, DEPUTY DISTRICT ATTORNEYS

OF LOS ANGELES COUNTY, THE FOLLOWING PROCEEDINGS WERE HELD:


         (NIKKI MILLER, CSR #3052,

         OFFICIAL REPORTER.)

1        THE COURT:  DEFENDANT EDWARD PALACIOS APPEARS WITH

2    COUNSEL, MS. WESTON; THE PEOPLE BY MR. DIXON, FOR

3    MR. TAKAKJIAN.

4                    THE MATTER IS ON FOR SENTENCING.

5                    I HAVE READ AND CONSIDERED THE REPORT OF

6    DEPUTY PROBATION OFFICER SMITH.

7                    I HAVE DISCUSSED THE MATTER WITH COUNSEL.

8                    I AM SATISFIED THAT THIS CASE IS A CASE THAT IS

9    A SECOND DEGREE MURDER CASE.

10                    I AM NOT PERSUADED THAT THE EVIDENCE COULD

11   ESTABLISH FIRST DEGREE MURDER, AND THEREFORE THIS CASE DOES

12   FALL WITHIN EXCEPTION NUMBER ONE TO PROPOSITION 8.

13                    I'M ALSO SATISFIED THAT THE SENTENCE IS ONE

14   THAT WOULD PROTECT SOCIETY, AND I HAVE CONSIDERED THAT

15   CAREFULLY.

16                    I DO NOTE WITH CREDIT, THAT BOTH THE PROBATION

17   OFFICER AND THE OFFICER INVESTIGATING THE CASE WERE THANKED

18   BY THE VICTIM'S FATHER IN THE REPORT FOR THEIR CARE AND

19   CONSIDERATION IN THIS MATTER.

20                    MS. WESTON.

21       MS. WESTON:  MAY I HAVE JUST A SECOND?

22       THE COURT:  SURE.

23

24            (BRIEF PAUSE.)

25

26       THE COURT:  MS. WESTON, READY TO PROCEED?

27       MS. WESTON:  YES.

28       THE COURT:  ALL RIGHT.

1        I AM PREPARED TO SENTENCE AS INDICATED.

2        DO YOU WAIVE FURTHER ARRAIGNMENT FOR JUDGMENT

3   AND SENTENCE?

4        MS. WESTON:  YES.

5        THE COURT:  ANY LEGAL CAUSE WHY WE CANNOT PROCEED?

6        MS. WESTON:  NO.

7        THE COURT:  ANY REMARKS ON BEHALF OF MR. PALACIOS?

8        ANY COMMENTS IN HIS BEHALF?

9        I SHOULD NOTE THAT THE REPORT NOTES THAT THIS

10  IS HIS FIRST FELONY --

11       MS. WESTON:  YES.

12       THE COURT:  -- OF ALL CONVICTIONS.

13       MS. WESTON:  I THINK THIS IS A VERY SAD CASE, AS

14  MR. PALACIOS' PROBATION REPORT INDICATES.  HE HAS NO ADULT

15  RECORD.

16       HE WAS EMPLOYED AT THE TIME.

17       HE IS IN COURT WITH HIS FAMILY, WHO CARE ABOUT

18  HIM VERY MUCH.

19       HE IS A YOUNG MAN.  AND I AM CERTAIN THAT HE'LL

20  DO WELL IN PRISON AND THAT HE'LL BE RELEASED AS SOON AS

21  POSSIBLE.

22       THE COURT:  ANY ADDITIONAL REMARKS?

23       MS. WESTON:  NO.

24       THE COURT:  MR. DIXON, IN BEHALF OF THE PEOPLE, I

25  ASSUME THAT THE PEOPLE, AS MR. TAKAKJIAN SAID EARLIER,

26  CONCUR THAT THE EVIDENCE ESTABLISHED -- WOULD ESTABLISH THE

27  OFFENSE OF WHICH THE DEFENDANT HAS PLEADED GUILTY, AND NOT

28  FIRST DEGREE MURDER.

1          MR. DIXON:  YES, YOUR HONOR.

2               I HAD AN OPPORTUNITY TO READ THE PROBATION

3    REPORT IN THIS CASE AND REVIEW THE FACTS.  AND IT IS MY

4    OPINION, BASED ON THAT, THAT THE PEOPLE COULD NOT PROVE

5    BEYOND A REASONABLE DOUBT THE ELEMENTS OF PREMEDITATION AND

6    DELIBERATION NECESSARY FOR A FIRST DEGREE MURDER CONVICTION.

7    THAT A SECOND DEGREE MURDER CONVICTION AND THE PLEA IN THIS

8    MATTER IS APPROPRIATE, ESPECIALLY IN LIGHT OF THE DEFENDANT'S

9    BACKGROUND, WHICH THE DEFENSE ATTORNEY JUST INDICATED IS

10   VOID OF ANY CONVICTIONS.

11          THE COURT:  YES.  THAT IS REFLECTED IN THE PROBATION

12   REPORT AND WHICH I HAVE CONSIDERED.

13          MR. DIXON:  I THINK IT IS AN APPROPRIATE SENTENCE.

14          THE COURT:  VERY WELL.

15               THE DEFENDANT HAVING PLEADED GUILTY TO AND

16   HAVING BEEN FOUND GUILTY OF SECOND DEGREE MURDER, THE COURT

17   SENTENCES AS FOLLOWS:

18               PROBATION IS DENIED.

19               THE DEFENDANT IS COMMITTED TO STATE PRISON

20   FOR THE TERM PRESCRIBED BY LAW.

21               AGAINST THAT HE IS TO BE CREDITED WITH 177 DAYS

22   OF ACTUAL TIME, PLUS 88 DAYS OF GOOD TIME/WORK TIME; FOR A

23   TOTAL OF 265 DAYS OF CREDIT.

24               IS THAT CORRECT?

25          MS. WESTON:  YES, YOUR HONOR.

26          THE COURT:  ALL RIGHT.

27               THAT WILL BE THE CREDIT.

28               DEFENDANT SHALL ALSO PAY A RESTITUTION FINE OF

1  $100 PER 13967 OF THE GOVERNMENT CODE.

2          ANY ADDITIONAL FEATURES OF THE SENTENCE

3  RECOMMENDED BY THE PEOPLE OR OBJECTIONS OR COMMENTS BY THE

4  PEOPLE?

5      MR. DIXON:  NO, THANK YOU.

6      THE COURT:  BY THE DEFENSE?

7      MS. WESTON:  NO.

8      THE COURT:  AS TO THE UNDETERMINED ENHANCEMENT

9  ALLEGATIONS AND THE BALANCE OF THE COUNTS, IF ANY,

10  MR. DIXON.

11      MR. DIXON:  MOTION TO DISMISS, PURSUANT TO THE CASE

12  SETTLEMENT.

13      THE COURT:  AND PURSUANT TO 1385 OF THE PENAL CODE

14  IN THE INTEREST OF JUSTICE, GRANTED.

15          ANYTHING ELSE?

16      MR. DIXON:  NO, THANK YOU.

17      THE COURT:  ALL RIGHT.

18

19

20          (PROCEEDINGS CONCLUDED.)

END
21

22

23

24

25

26

27

28

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               FOR THE COUNTY OF LOS ANGELES

3    DEPARTMENT NO. 112     HON. ALEXANDER H. WILLIAMS, III, JUDGE

4

5    THE PEOPLE OF THE STATE OF CALIFORNIA,      )
                                                 )
6                             PLAINTIFF,         )   NO. A-772 728
                                                 )
7         VS.                                    )   REPORTER'S
                                                 )   CERTIFICATE
8    EDWARD PALACIOS,                            )
                                                 )
9                             DEFENDANT.         )
     _____   )

10

11   STATE OF CALIFORNIA   )
                           ) SS
12   COUNTY OF LOS ANGELES )

13              I, NIKKI MILLER, OFFICIAL REPORTER OF THE

14   SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF

15   LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE

16   AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD AT THE TIME

17   OF PRONOUNCING SENTENCE;

18              THAT THE VIEWS AND RECOMMENDATIONS OF THE COURT,

19   IF ANY, ARE CONTAINED HEREIN, PURSUANT TO SECTION 1203.01 OF

20   THE PENAL CODE.

21              DATED THIS 14TH DAY OF APRIL, 1986.

22

23

24                    /S/   NIKKI MILLER
                      _____
25                    NIKKI MILLER, CSR #3052
                      OFFICIAL REPORTER

26

27

28

EXHIBIT 3

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES
PROBATION OFFICER'S REPORT

REPORT SEQUENCE NO.

| DEFENDANT'S NAME(S) EDWARD PALACIOS | COURT 112 | JUDGE A. WILLIAMS | COURT CASE NO. A-772728 |
|---|---|---|---|

ADDRESS (PRESENT / RELEASE)
3368 LOUISE, APT. C
LYNWOOD, CA.

| HEARING DATE 3-21-86 | DEFENSE ATTY. L. WESTON | PROSECUTOR P. TAKAJIAN |
|---|---|---|

| BIRTHDATE 10-14-64 | AGE 21 | SEX M | RACE MEX-AM |
|---|---|---|---|

| DPO G.S. SMITH | AREA OFFICE PV | PHONE NO. 623-6811 EXT. 436 |
|---|---|---|

CITIZENSHIP STATUS U.S.

DRIVER'S LICENSE / EXP. DATE NOT IN POSSESSION

| PROBATION NO. X-- | CII NO. N/A | BOOKING NO. 8259632 |
|---|---|---|

TYPE REPORT
XX Probation and sentence
_____ Pre-Conviction (131.3 CCP)
_____ Post sentence
_____ Diversion (Specify) _____

DAYS IN JAIL THIS CASE
☐ ESTIMATED ☒☒ VERIFIED 177

CUSTODY STATUS/RELEASE DATE
JAIL

## PRESENT OFFENSE: LEGAL HISTORY

CHARGED with the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

187(A) PC (MURDER) WITH ENHANCEMENT OF VIOLATION OF SECTION 12022(B) PC (PERSONALLY USED A DEADLY AND DANGEROUS WEAPON, TO WIT, A KNIFE), CT. I

CONVICTED of the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

187(A) PC (MURDER - SECOND DEGREE); DETERMINATION AS TO THE LISTED ENHANCEMENT WILL BE HANDLED AT THE TIME OF THE P&S HEARING.

| CONVICTED BY | DATE OF CONVICTION/XXXXXXXX 2-28-86 | COUNT(S) CONTINUED TO P & S FOR DISPOSITION N/A |
|---|---|---|

| PROPOSED PLEA AGREEMENT NONE REPORTED | SOURCES OF INFORMATION N/A |
|---|---|

| DATE(S) OF OFFENSE 9-2-85 | TIME(S) APPROX. 1:40 A.M. |
|---|---|

DEFENDANT:
(SEE PRIOR RECORD SECTION)
☐ N/A
☐ ON PROBATION
☐ ON PAROLE-REMAINING TIME
☐ SENTENCED TO STATE PRISON/COUNTY JAIL ON CASE _____
☐ PENDING PROBATION VIOLATION
☐ PENDING NEW CASE

HOLDS/WARRANTS:
☐ YES ☐ NO

RECOMMENDATION:

☐ PROBATION  ☒ DENIAL  ☐ DIAGNOSTIC STUDY  ☐ CYA  ☐ OTHER _____
            ☐ COUNTY JAIL  ☐ 707.2 WIC
            ☐ STATE PRISON  ☐ 1203.03 PC

| PRESENT OFFENSE: (CONTINUED) | SOURCES OF INFORMATION (this page) D.A. FILE | | | |
|---|---|---|---|---|

| ARREST DATE 9-25-85 | TIME 5 PM | BOOKED AS | OFFENSE 187 PC (HOMICIDE) | LOCATION OF ARREST D.S.L. TRANSPORTATION COMPANY – SOUTH GATE, CALIFORNIA | ARRESTING AGENCY LENNOX SO |
|---|---|---|---|---|---|

| CO-DEFENDANT(S) CARLOS SOTO | CASE NO. A-772728 | DISPOSITION P&S HEARING SCHEDULED 3-28-86 IN DEPT. 112 FOR VIOLATION OF 245(A)(1) PC – CT. II. |
|---|---|---|

**ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:**

AT APPROXIMATELY 1:40 A.M. ON SEPTEMBER 2, 1985, WHILE 17-YEAR-OLD EDDY ANGULO WAS AT LENNOX PARK WITH HIS GIRLFRIEND AND OTHER ACQUAINTANCES, A TRUCK DRIVEN BY EDWARD PALACIOS APPROACHED ANGULO. THIS TRUCK ALSO CONTAINED CARLOS SOTO AND 14-YEAR-OLD ROBERT SANDEN AS PASSENGERS. SOMEONE IN THE TRUCK ASKED MR. ANGULO WHERE HE WAS FROM AND ONCE HE STATED--LENNOX, A VERBAL CONFRONTATION DEVELOPED WITH THE OCCUPANTS OF THE TRUCK EVENTUALLY EXITING THE VEHICLE AND APPROACHING MR. ANGULO. ROBERT SANDEN USED A BASEBALL BAT TO STRIKE THE VICTIM WHILE CARLOS SOTO ALSO USED A BASEBALL BAT TO STRIKE THE VICTIM. EDWARD PALACIOS USED A KNIFE TO STAB THE VICTIM. AFTER THE STABBING, THE ASSAILANTS RETURNED TO THEIR VEHICLE AND DROVE OFF. PARAMEDICS WERE SUMMONED BY ACQUAINTANCES OF THE VICTIM AND HE WAS SUBSEQUENTLY TRANSPORTED TO DANIEL FREEMAN HOSPITAL WHERE HE SUBSEQUENTLY DIED AT APPROXIMATELY 6:20 P.M. ON SEPTEMBER 9, 1985.

THE VICTIM WAS LISTED AS CORONER CASE NO. 85-11548 WITH THE CORONER DETERMINING THAT THE CAUSE OF DEATH WAS FROM ACUTE

-2-(PALACIOS)

1    MIOCARDIAL INFARCTIM DUE TO A STAB WOUND PENETRATING THE HEART AND

2    CUTTING THE RIGHT CORONARY ARTERY.  THE VICTIM WAS DETERMINED TO

3    HAVE SUSTAINED SIX SEPARATE STAB WOUNDS TO HIS CHEST AND ABDOMEN.

4    HE HAD ALSO SUSTAINED A LARGE BRUISE TO THE LEFT RIB CAGE WHICH HAD

5    DEVELOPED SOME HEMORRHAGING.

6            ACQUAINTANCES OF THE DECEASED IDENTIFIED 14-YEAR-OLD

7    ROBERT SANDEN AS ONE OF THE ASSAILANTS AND WHEN OFFICERS WERE ABLE

8    TO LOCATE HIM, HE WAS SUBSEQUENTLY ARRESTED FOR THE CHARGE OF HOMICIDE.

9    HE ADMITTED TO INVESTIGATING SHERIFF'S DEPUTY HE HAD IN FACT HIT THE

10   VICTIM WITH A BASEBALL BAT AND HE THEN PROCEEDED TO IDENTIFY EDWARD

11   PALACISO (STREET NAME OF - PAYASO'S), AS THE PERSON WHO HAD STABBED

12   THE VICTIM.  THIS YOUNGSTER THEN PROCEEDED TO IDENTIFY CARLOS SOTO

13   BY HIS STREET NAME - BEAVER, AS THE PERSON THAT HAD ALSO STRUCK THE

14   VICTIM WITH A BASEBALL BAT.

15           CARLOS SOTO WAS ARRESTED IN FRONT OF HIS HAWTHORNE

16   RESIDENCE ON SEPTEMBER 25, 1985, AND DURING AN INTERVIEW ON THAT

17   DATE WITH SHERIFF'S DEPUTIES, HE DENIED BEING IN LENNOX PARK AT THE

18   TIME THE VICTIM HAD BEEN ASSAULTED.  EDWARD PALACIOS WAS ARRESTED ON

19   SEPTEMBER 25, 1985, AS HE WAS LEAVING HIS PLACE OF EMPLOYMENT IN

20   SOUTH GATE AND HE ALSO DENIED BEING PRESENT AT LENNOX PARK WHEN THE

21   VICTIM WAS ASSAULTED.

22           AT EDWARD PALACIOUS TRIAL ON FEBRUARY 28, 1986, HE

23   PLEADED GUILTY TO THE CHARGE OF SECOND DEGREE OF HOMICIDE WITH THE

     -3-(PALACIOS)

COURT THEN SETTING THE PROBATION AND SENTENCING HEARING FOR TODAY'S
DATE WHILE ALSO SPECIFYING A DETERMINATION WOULD BE MADE AT THE P&S
HEARING AS TO THE ALLEGED ENHANCEMENT.   ON FEBRUARY 28, 1986, CARLOS
SOTO WAS ALLOWED TO PLEAD GUILTY AT HIS TRIAL TO THE ADDED CHARGE OF
VIOLATION OF SECTION 242(A)(1) PENAL CODE – COUNT TWO, WITH THE COURT
THEN SCHEDULING A DISPOSITION AS TO COUNT ONE, 187(A) PENAL CODE FOR
THE TIME OF THE PROBATION AND SENTENCE HEARING WHICH WAS THEN SCHEDULED
FOR MARCH 28, 1986.

-4-(PALACIOS)

| VICTIM: | SOURCES OF INFORMATION (this page)<br>D.A. FILE |
| --- | --- |

| NAME<br>EDDY ANGULO | COUNT(S)<br>I & II |
| --- | --- |

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

DIED SEPTEMBER 9, 1985, AS THE DIRECT RESULT OF STAB WOUND INJURIES.

INSURANCE COVERAGE

NONE

| LOSS: ☒ YES ☐ NO | ESTIMATED LOSS<br>N/A | RESTITUTION ALREADY MADE<br>N/A | APPLIED FOR VICTIM RESTITUTION FUND<br>☐ UNK ☐ YES ☐ NO N/A |
| --- | --- | --- | --- |

VICTIM STATEMENT:

BECAUSE OF THE DEATH OF THE 17-YEAR-OLD VICTIM, THE PROBATION OFFICER WAS OBLIGATED TO INTERVIEW THIS VICTIM'S FATHER, MR. GUILLERMO ANGULO. COMMENTS OBTAINED FROM THIS VICTIM'S FATHER WILL BE COVERED IN THE NEXT PARAGRAPH.

MR. GUILLERMO ANGULO WAS INTERVIEWED BY THE PROBATION OFFICER ON MARCH 11, 1986, AND HE STATED THAT ALL OF HIS SON'S MEDICAL BILLS HAD BEEN PAID BY MEDI-CAL. HIS SON'S FUNERAL EXPENSES WERE PAID THROUGH THE "VICTIM'S OF VIOLENT CRIME FUND" AS ADMINISTERED BY THE STATE OF CALIFORNIA. THE FATHER HAS NO IDEA AS TO THE SPECIFIC COST OF THE FUNERAL OR HIS SON'S SEVEN-DAY TENURE AT DANIEL FREEMAN HOSPITAL SINCE NONE OF THE BILLS WERE EVER FORWARDED TO HIM.

THIS FATHER VIEWED THE DECEASED AS A FORMER ACTIVE LENNOX GANG MEMBER. HE FELT THAT FOR THE PAST YEAR OR SO, HIS SON HAD BEEN MORE INVOLVED IN LEARNING TO BE A BOXER AND PARTICIPATING IN THE JOB CORPS THAN IN FUNCTIONING AS A GANG MEMBER. MR. ANGULO

| RESTITUTION | TOTAL NUMBER OF VICTIMS<br>1 | ESTIMATED LOSS TO ALL VICTIMS<br>UNKNOWN | VICTIM(S) NOTIFIED OF P&S HEARING<br>☒ YES ☐ NO |
| --- | --- | --- | --- |
| DOES DEFENDANT HAVE INSURANCE<br>TO COVER RESTITUTION:<br>☐ YES ☒ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO.<br>N/A | |

-5-(PALACIOS)                                    _____VICTIM LIST CONTINUES NEXT PAGE

WAS ELATED TO LEARN THAT HIS SON'S MURDERER HAS BEEN FOUND GUILTY.
HE HOPES THE COURT WILL SEND HIS SON'S MURDERER TO PRISON AND --
"ANYBODY ELSE THAT HARMED EDDY SHOULD GO TO PRISON.    TELL THIS TO
THE JUDGE FOR ME.    YOU, SENOR SMITH, AND DETECTIVE DURAN HAVE BEEN
VERY GOOD TO ME.    THANK YOU VERY MUCH."

-6-(PALACIOS)

PRIOR RECORD:

> **SOURCES OF INFORMATION (this page)**
> CII (3-14-86), LOS ANGELES COUNTY PROBATION
> DEPT. INDEX, DEFENDANT'S STATEMENT

AKA'S: DEFENDANT HAS THE STREET NICKNAMES OF "PAYASO" AND "CLOWN"

## JUVENILE HISTORY:

5-24-79          HAWTHORNE PD - 459 PC (BURGLARY). PETITION REQUESTED.

(DEFENDANT STATED THAT HE AND A NUMBER OF HIS FRIEND HAD DECIDED
TO BE TRUANT FROM SCHOOL AND EVENTUALLY DECIDED TO BURGLARIZE A
RESIDENCE. HE AND HIS COMPANIONS STOLE SOME MONEY FROM THE
RESIDENCE AND WERE APPREHENDED BY POLICE THAT HAD BEEN CALLED
BY THE VICTIM'S NEIGHBORS. DEFENDANT RECALLED GOING TO COURT
AND HAVING THE JUDGE PLACING HIM HOME ON PROBATION FOR A PERIOD
OF ONE YEAR.)

2-4-80           LASO - 12020(A) PC (POSSESSION OF A DANGEROUS WEAPON) -
                 RELEASED DUE TO INSUFFICIENT EVIDENCE.

(DEFENDANT ACKNOWLEDGED THIS ARREST AND STATED THE ARRESTING
OFFICERS BELIEVED THAT NUNCHUK STICKS WHICH HAD BEEN CONFISCATED
HAD BEEN HIS PROPERTY. HE CLAIMED THESE MARTIAL ARTS TOOL WERE
OWNED BY ONE OF HIS FRIENDS THAT HAPPENED TO HAVE BEEN STANDING
NEXT TO HIM WHEN ALL OF THESE PERSONS WERE ARRESTED. WHEN THE
FRIEND SAW SHERIFF'S DEPUTIES APPROACHING, HE DROPPED THE STICKS
TO THE GROUND AND THE DEFENDANT DID NOT FEEL THAT SHERIFF'S
DEPUTIES OBSERVED THE STICKS BEING DROPPED BY HIS FRIEND.
DEFENDANT FELT THAT HE HAD BEEN RELEASED FROM CUSTODY AFTER
POSSIBLY SPENDING 48 HOURS.)

5-7-80           HAWTHORNE PD - 148 PC (RESISTING ARREST) AND 20001 VC
                 (HIT AND RUN INJURY). COUNSELED AND RELEASED.

(DEFENDANT ACKNOWLEDGED THIS ARREST AND STATED HE HAD BEEN A
PASSENGER IN AN AUTOMOBILE THAT HIT A MOTORCYCLIST. ONCE THE
DRIVER REALIZED WHAT HE DID, HE ATTEMPTED TO FLEE THE SCENE.
POLICE THAT HAPPENED UPON THE CRIME SCENE AT ABOUT THE SAME
TIME THAT THE CRIME WAS BEING COMMITTED, GAVE CHASE AND
EVENTUALLY DETAINED THE FLEEING VEHICLE. ONCE THE DRIVER
STATED THAT HE WAS THE DRIVER AND HIS TWO PASSENGERS HAD NO
INVOLVEMENT IN THE HIT AND RUN, DEFENDANT WAS RELEASED FROM
CUSTODY. EVEN THOUGH THE POLICE OFFICERS CHOSE TO RELEASE THE
DEFENDANT, THEY STILL FELT THAT HE HAD NOT BEEN COOPERATIVE
DURING THEIR INVESTIGATION.)

7-27-80          HAWTHORNE PD - 25662 B&P (MINOR IN POSSESSION OF AN
                 ALCOHOLIC BEVERAGE) - COUNSELED AND RELEASED.

(DEFENDANT ACKNOWLEDGED THIS ARREST AND STATED HE AND A FRIEND
HAD BEEN DRINKING BEER AT A CARNIVAL AND ONCE THEY RETURNED TO
THE FRIEND'S AUTOMOBILE, POLICE OFFICERS APPROACHED, OBSERVED
THEM HOLDING OPEN CONTAINERS OF BEER AND THEN PROCEEDED TO ARREST

ARREST HIM. DEFENDANT BELIEVES THAT HE SPENT APPROXIMATELY EIGHT HOURS IN JAIL PRIOR TO BEING RELEASED.)

3-10-81        LASO - LYNWOOD, 488 PC (PETTY THEFT) - PETITION REQUESTED.

(DEFENDANT CLAIMED THAT HE STOLE A BICYCLE FROM THE FRONT OF A NEIGHBORHOOD MARKET SINCE HE WAS TIRED AND HAD BEEN WALKING HOME. SHORTLY AFTER ARRIVING AT HIS RESIDENCE, SHERIFF'S DEPUTIES ARRIVED AND TOOK HIM INTO CUSTODY FOR THE THEFT OF THE BICYCLE. THE DEFENDANT RECALLED BEING INTERVIEWED AT THE LYNWOOD SHERIFF'S STATION FOR A NUMBER OF HOURS AND THEN BEING ADVISED THAT NO OFFICIAL CHARGES WOULD BE FILED.)

6-20-81        LASO - LYNWOOD, 647(F) PC (DRUNK). PETITION REQUESTED.

(DEFENDANT STATED THAT HE AND SOME OF HIS FRIENDS HAD BEEN DRINKING BEER AND DECIDED TO WALK TO A HOUSE WHERE THEY KNEW SOME GIRLS LIVED. THE GIRLS DID NOT ALLOW THEM ENTRY BUT STILL CALLED THE POLICE. WHEN THE POLICE OFFICERS ARRIVED, THEY PROCEEDED TO ARREST DEFENDANT AND HIS FRIENDS FOR PUBLIC INTOXICATION. ALL WERE RELEASED FROM THE LYNWOOD SHERIFF'S STATION WITHIN 24 HOURS AND THE DEFENDANT DID NOT FEEL THAT ANY OF THE PERSONS ARRESTED EVER HAD TO GO TO COURT.)

ADULT HISTORY:

(NONE).

-8-(PALACIOS)

76C692G — PROB. 5A —  PS 1-85

PERSONAL HISTORY:
(CONTINUED)

SOURCES OF INFORMATION (this page)
DEFENDANT

| RESIDENCE · | TYPE RESIDENCE APARTMENT | LENGTH OF OCCUPANCY 5 YEARS | MORTGAGE/RENT $300 ROOM AND BOARD | RESIDES WITH/RELATIONSHIP MOTHER |
|---|---|---|---|---|
| RESIDENTIAL STABILITY LAST FIVE YEARS GOOD | | CAME TO STATE / FROM BORN | | CAME TO COUNTY / FROM BORN |

Additional information    DEFENDANT IS THE EIGHTH BORN OF FOUR MALES AND FIVE

FEMALES TO THE MARRIAGE OF JOSEPH PALACIOS AND LUPE MARIA GONZALES

IN LOS ANGELES, CALIFORNIA.  DEFENDANT BELIEVES THAT HE WAS

APPROXIMATELY 13 YEARS OF AGE WHEN HIS PARENTS SEPARATED WITH HE AND

HIS SIBLINGS THEN BEING RAISED EXCLUSIVELY BY THEIR MOTHER.   HE HAS

ALWAYS LIVED IN EITHER THE HAWTHORNE, WATTS OR LYNWOOD AREA.  HIS

MOTHER IS CURRENTLY RETIRED AND SUPPORTED BY SOCIAL SECURITY WHILE

THE DEFENDANT'S FATHER DIED OF UNKNOWN CAUSES IN JANUARY OF 1986.⚹

| MARRIAGE / PARENTHOOD | MARITAL STATUS COHABITATION | NAME OF SPOUSE / PRESENT COHABITANT XXXX MONICA JARAMILLA(19 YRS) |
|---|---|---|
| LENGTH OF UNION SINCE DECEMBER 1984 | NO. OF CHILDREN THIS UNION NONE | SUPPORTED BY N/A |
| NO. PRIOR MARRIAGES / COHABITATIONS NONE | NO. OF CHILDREN THESE UNIONS NONE | SUPPORTED BY N/A |
| NO. OF OTHER CHILDREN NONE | SUPPORTED BY N/A | |

Additional information
⚹IT IS TO BE NOTED THAT EVEN THOUGH THE DEFENDANT

ACKNOWLEDGES LIVING WITH HIS MOTHER AND PAYING HER $300 PER MONTH

ROOM AND BOARD, HE ALSO STATES HE RESIDES IN THE APARTMENT OF HIS

GIRLFRIEND - MONICA JARAMILLA, 12119 ALPINE AVENUE, LYNWOOD, ON AN

AVERAGE OF THREE NIGHTS PER WEEK.  THIS TYPE OF A LIVING ARRANGEMENT

HAS EXISTED FOR THE PAST YEAR.

        IT IS THE DEFENDANT'S DESIRE TO RESUME HIS JOINT LIVING+

FORMAL EDUCATION:
TENTH GRADE AT LYNWOOD HIGH SCHOOL

PERSONAL HISTORY:

---

**SUBSTANCE ABUSE:**

_____ No record, indication, or admission of alcohol or controlled substance abuse.

__XX__ Occasional social or experimental use of __PHENCYCLIDINE AND BEER__ _____ acknowledged.

_____ See below:  Indication / admission of significant substance abuse problem.

Referred to Narcotic Evaluator ☐ Yes ☐ No          _____ Narcotic Evaluator's report attached

---

Additional information     DEFENDANT STATED THAT HE WAS 15 YEARS OF AGE WHEN HE FIRST USED PHENCYCLIDINE. HE VIEWED HIS INITIAL USAGE AS SOMETHING THAT HAD OCCURRED "MAYBE ONCE OR TWICE A MONTH. IT WAS THIS WAY FOR MAYBE THE NEXT FOUR YEARS. DURING 1985 I STARTED SMOKING PCP EVERY WEEKEND. I LIKED GETTING HIGH AND IT DIDN'T COST ME ANY MORE THAN MAYBE $50. I USED TO LIKE TO SHARE IT WITH MY FRIENDS BUT I STOPPED SINCE I'VE BEEN IN JAIL."

---

**PHYSICAL / MENTAL / EMOTIONAL HEALTH:**

__X__ No indication or claim of significant physical/mental/emotional health problem.

_____ See below:  Indication / claim of significant physical/mental/emotional health problem.

---

Additional information

-9-(PALACIOS)

1  MARRIAGE/PARENTHOOD:+

2  ARRANGEMENT WITH HIS CONSENSUAL SPOUSE AND HIS MOTHER WHENEVER HE IS

3  RELEASED FROM CUSTODY.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

-11-(PALACIOS)

PERSONAL HISTORY:
(CONTINUED)

SOURCES OF INFORMATION (this page)
DEFENDANT

| EMPLOYMENT STATUS | ☐ EMPLOYED ☒ UNEMPLOYED | REFERRED TO WORK FURLOUGH ☐ YES ☒ NO | EMPLOYER AWARE OF PRESENT OFFENSE ☒ YES ☐ NO |
|---|---|---|---|

| PRESENT/LAST EMPLOYER / ADDRESS / PHONE | OCCUPATION (LAST) | PERIOD OF EMPLOYMENT | GROSS MONTHLY WAGE |
|---|---|---|---|
| D.S.L. TRANSPORTATION CORPORATION - SOUTH GATE | FOREMAN | 18 MONTHS | $8 AN HOUR |

| | EMPLOYMENT STABILITY LAST 5 YEARS | TYPES OF PREVIOUS EMPLOYMENT |
|---|---|---|
| ☒ VERIFIED  ☐ UNVERIFIED | FAIR. | FACTORY WORKER |

Additional information   DEFENDANT WAS ARRESTED FOR THIS INSTANT COURT MATTER

AT HIS PLACE OF BUSINESS AND DEFENDANT CLAIMS THAT IT IS HIS

UNDERSTANDING THAT HE WILL BE ABLE TO REGAIN HIS JOB ONCE HE IS

RELEASED FROM CUSTODY.  HE HAD BEEN ASSIGNED AS THE FOREMAN FOR THE

SHIPPING CLERKS AND VIEWS HIMSELF AS BEING AN EXCELLENT WORKER.

| FINANCIAL STATUS | INCOME STABILITY CURRENTLY POOR | | NET MONTHLY INCOME NONE | |
|---|---|---|---|---|
| PRIMARY INCOME SOURCE NONE | SECONDARY INCOME SOURCE(S) NONE | | EST. TOTAL ASSETS NONE | EST. TOTAL LIABILITIES NONE |

MAJOR ASSETS / ESTIMATED VALUE

OWNERSHIP OF A 1985 NISSAN AUTOMOBILE WITH APPROXIMATELY $6,000 STILL
OWED AND MONTHLY PAYMENTS OF $169.  DEFENDANT BELIEVES THAT HIS MOTHER
AND HIS CONSENSUAL SPOUSE HAVE BEEN MAKING THE REQUIRED MONTHLY PAYMENTS
ON THIS VEHICLE DURING HIS CURRENT INCARCERATION.

MAJOR LIABILITIES / ESTIMATED AMOUNT (MONTHLY)
NONE LISTED

Additional information

GANG ACTIVITY    ☐ YES    ☐ NO          Name of Gang _____

-12-(PALACIOS)

DEFENDANT'S STATEMENT:

DEFENDANT WAS INTERVIEWED AT THE LOS ANGELES COUNTY JAIL AND OFFERED THE FOLLOWING COMMENTS:

HE CLAIMS HE PLEADED GUILTY BECAUSE HIS ATTORNEY TOLD HIM HE COULD NOT WIN HIS CASE AND QUITE POSSIBLY, THE COURT WOULD HAVE GIVEN HIM THE MAXIMUM SENTENCE IF HE HAD PUSHED THE CASE ALL THE WAY TO A JURY TRIAL AND THEN LOST. HE WENT ON TO STATE THAT VARIOUS FRIENDS OF HIS HAVE GOTTEN WORD TO HIM THAT THE JUVENILE (ROBERT SANDEN) HAD BEEN PRESSURED BY LENNOX SHERIFFS TO STATE THAT HE PLAYED A MINOR ROLE IN THE ASSAULT AND EVENTUAL HOMICIDE WHILE THE DEFENDANT AND THE CODEFENDANT PLAYED THE MAJOR ROLES.

AT NO TIME DURING THE INTERVIEW WITH THIS DEFENDANT DID HE STATE THAT HE WAS SORRY FOR HIS ACTIONS. THE CLOSEST TYPE OF REMORSE, MADE BY THE DEFENDANT WAS AS FOLLOWS: "IT WAS SOMETHING THAT JUST HAPPENED. I DIDN'T GO OUT TO KILL ANYBODY."

THIS DEFENDANT'S GOALS FOR THE FUTURE ARE TO RESUME HIS CURRENT EMPLOYMENT AND TRY TO CONTINUE WITH HIS LIFE WITHOUT HAVING HIS CURRENT FELONY CONVICTION BECOME A TOTAL DISASTER FOR HIM. HE ACKNOWLEDGES THAT HE HAS BEEN A MEMBER OF THE - "LIL WATTS" GANG SINCE 1976 BUT HAS NOW DECIDED THAT IT WOULD BE TO HIS BEST INTEREST TO PERMANENTLY SEVER THESE ASSOCIATIONS. HE WAS VERY PROUD OF THE FACT THAT HE ONLY HAS THIS INSTANT COURT MATTER AS AN ADULT CRIMINAL SITUATION AND HE DOES NOT ANTICIPATE ANY NEW LAW VIOLATIONS

-13-(PALACIOS)

IN THE FUTURE.

INTERESTED PARTIES:

DETECTIVE RON LANCASTER IS ONE OF THE LISTED INVESTIGATORS, HOWEVER, HE IS NO LONGER ASSIGNED TO THE HOMICIDE DIVISION AND THE PROBATION OFFICER WAS UNABLE TO PERSONALLY INTERVIEW HIM. DETECTIVE BARRY JONES WAS ON A TEMPORARY LEAVE FROM HIS HOMICIDE DETAIL AND WILL NOT RETURN TO WORK UNTIL THE MARCH 17, 1986. HOWEVER, THE PROBATION OFFICER WAS ABLE TO INTERVIEW DETECTIVE DURAN OF THE LENNOX SHERIFF'S STATION ON MARCH 11, 1986. DETECTIVE DURAN IS ASSIGNED TO OPERATION SAFE STREETS AND HE ACKNOWLEDGED HAVING TOTAL MEMORY AS TO BOTH DEFENDANTS. HE WANTED TO GO ON RECORD AS OFFERING THE FOLLOWING COMMENTS:

"BOTH SHOULD BE SENT TO PRISON. THEY INITIATED THIS VIOLENCE. WE HAVE ID'D BOTH SOTO AND PALACIOS AS ACTIVE LIL WATTS GANG MEMBERS. PALACIOS IS LOOKED UPON BY YOUNGER GANG MEMBERS AS A LEADER AND SOTO WILL DO ANYTHING ASKED OF HIM. IF THE COURT ALLOW EITHER PALACIOS OR SOTO TO REMAIN IN THE COMMUNITY THEIR GANG MEMBERS WILL LOOK UPON THEM AS HEROES. ALSO, THE VICTIM'S GANG MIGHT FEEL THE NEED TO ENGAGE IN ONGOING VIOLENCE IN ORDER TO AVENGE THE DEATH OF ONE OF THEIR OWN."

DETECTIVE DURAN WANTS TO GO ON RECORD AS STATING HE WAS EXTREMELY DISAPPOINTED ONCE LEARING THAT THE DISTRICT ATTORNEY

-14-(PALACIOS)

1   AND THE COURT ALLOW PALACIOS TO PLEAD GUILTY TO SECOND DEGREE MURDER

2   AND THEN ALLOWED SOTO TO PLEAD TO ASSAULT.  HE DID NOT FEEL THAT

3   EITHER DEFENDANT WARRANTED THAT TYPE OF LENIENCY.

4   EVALUATION:

5                  FROM WHAT THE PROBATION OFFICER HAS BEEN ABLE TO LEARN

6   ABOUT THIS CASE, THERE WAS NO JUSTIFICATION FOR THE VICTIM BEING

7   ASSAULTED WITH BASEBALL BATS AND EVENTUALLY BEING STABBED BY THE

8   DEFENDANT.  YES, THIS VICTIM WAS A MEMBER OF THE LENNOX GANG WHILE

9   HIS ASSAILANTS WERE MEMBERS OF LIL WATTS GANG.  HOWEVER, IT WOULD

10  APPEAR THAT THE ASSAILANTS WENT INTO THE TERRITORY OF THE VICTIM,

11  PROVOKED THE VICTIM VERBALLY AND THEN INITIATED THE VIOLENT

12  CONFRONTATION.  NO TYPE OF SENTENCE IMPOSED BY THE COURT WILL BRING

13  THE VICTIM BACK TO LIFE, HOWEVER, THE SENTENCE THAT IS GIVEN MUST

14  DEMONSTRATE TO ALL CONCERNED GANG MEMBERS THAT THE LAW DEMANDS JUSTICE

15  FROM WHOEVER IS FOUND GUILTY OF COMMITTING CRIMES OF VIOLENCE.

16                  EVEN THOUGH THIS DEFENDANT SEEMS TO BE VOID OF A

17  PRIOR CRIMINAL RECORD, IT MUST BE NOTED THAT IN ACCORDANCE WITH

18  THE OFFENSE FOR WHICH HE HAS PLEADED GUILTY, HE WOULD NOT APPEAR

19  TO BE ELIGIBLE FOR PROBATION CONSIDERATION.  THEREFORE, A COMMITMENT

20  TO THE DEPARTMENT OF CORRECTIONS SEEMS NECESSARY.  IF THE COURT CHOOSES

21  TO VIEW THIS DEFENDANT AS BEING THE TYPE OF PERSON THAT WARRANTS

22  LENIENCY FROM THE COURT, THE PROBATION OFFICER WOULD HAVE NO OBJECTION

23  IF THE COURT IMPOSED A MID-BASE TERM IN STATE PRISON.

-15-(PALACIOS)

SENTENCING CONSIDERATIONS:

FACTORS IN AGGRAVATION:

1. THE DEFENDANT WAS ARMED WITH OR USED A WEAPON AT THE TIME OF THE COMMISSION OF THE CRIME, WHETHER OR NOT CHARGED OR CHARGEABLE AS AN ENHANCEMENT UNDER SECTION 12022 OR 12022.5 PENAL CODE.

2. THE CRIME INVOLVED GREAT VIOLENCE, GREAT BODILY HARM, THREAT OF GREAT BODILY HARM OR OTHER ACTS, DISCLOSING A HIGH DEGREE OF CRUELTY, VICIOUSNESS OR CALLOUSNESS WHETHER OR NOT CHARGED OR CHARGEABLE AS AN ENHANCEMENT UNDER SECTION 12022.7 PENAL CODE.

3. THE DEFENDANT INVOLVED MINORS IN THE COMMISSION OF THE CRIME.

4. HIS INVOLVEMENT IN THIS INSTANT ACTIVITY WOULD SEEM TO INDICATE HE IS A SERIOUS DANGER TO SOCIETY.

FACTORS IN MITIGATION:

1. HE HAS NO PRIOR CRIMINAL RECORD.

IN ACCORDANCE WITH PENAL CODE SECTION 1203E(2), DEFENDANT  WOULD APPEAR TO BE INELIGIBLE FOR PROBATION CONSIDERATION. A COMMITMENT TO THE DEPARTMENT OF CORRECTIONS AT THE MID TERM IS VIEWED AS APPROPRIATE.

RECOMMENDATION:

IT IS RECOMMENDED THAT PROBATION BE DENIED AND THAT DEFENDANT BE SENTENCED TO STATE PRISON WITH PRE-IMPRISONMENT CREDIT OF 177 DAYS; THAT THE COURT ORDER THE DEFENDANT TO PAY A RESTITUTION

-16-(PALACIOS)

1    FINE OF $10,000 PROVIDED IN SECTION 13967(A) OF THE GOVERNMENT CODE.

2    RESPECTFULLY SUBMITTED,

3    BARRY J. NIDORF,
       PROBATION OFFICER

4

5

6    BY _____
       GUSTAVE S. SMITH, DEPUTY
       POMONA VALLEY AREA OFFICE

7    623-6811 EXT. 436

8

9    READ AND APPROVED            I HAVE READ AND CONSIDERED
                                       THE FOREGOING REPORT OF THE

10                                        PROBATION OFFICER

11    KENNETH FORNEY, SDPO

12    (SUBMITTED 3/14/86)          _____
       (TYPED 3/15/86)              JUDGE OF THE SUPERIOR COURT

13    GS:SH(8)

14

15

16

17

18

19

20

21

22

23    -17-(PALACIOS)

EXHIBIT 4

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )          CDC Number D-27035
                          )
EDWARD PALACIOS           )
                          )          **INMATE**
_____)          **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 3, 2005    **PENDING REVIEW**
9:04 A.M.        **AND APPROVAL**

PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
BILL KEENAN, Deputy Commissioner

OTHERS PRESENT:

EDWARD PALACIOS, Inmate
MARY ANN TARDIFF, Attorney for Inmate
DEBRA ARCHULETA, Deputy District Attorney,
          Observer (arrived during deliberations)

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No      See Review of Hearing
_____   Yes     Transcript Memorandum

Ramona Cota              Peters Shorthand Reporting

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 9 |
| Pre-Commitment Factors | 14 |
| Post-Commitment Factors | 29 |
| Parole Plans | 22 |
| Closing Statements | 55 |
| Recess | 64 |
| Decision | 65 |
| Adjournment | 76 |
| Transcriber Certification | 77 |

--oOo--

1

1        **P R O C E E D I N G S**

2        **DEPUTY COMMISSIONER KEENAN:**  We are on

3    record.

4        **PRESIDING COMMISSIONER SAWYER:**  Okay,

5    good morning.  This is a Subsequent Parole

6    Hearing for Edward Palacios.  Did I pronounce

7    that correctly?

8        **INMATE PALACIOS:**  Yes.

9        **PRESIDING COMMISSIONER SAWYER:**  Palacios,

10   CDC number D-27035.  Today's date is August 3rd,

11   2005, time is 9:04 a.m., we are located at CTF,

12   Soledad.  The inmate was received on 3/31 of

13   '86, committed from Los Angeles County.  The

14   life term began 3/31/86, his minimum eligible

15   parole date was 2/19/95.  The controlling

16   offense set forth in case number A772728

17   charging one count of violation of 187 second

18   degree.  There are no other counts and he

19   received a term of 15 to life.  This hearing is

20   being tape-recorded.  For the purpose of voice

21   identification each one of us is being required

22   to state our first and last name, spelling your

23   last name.  When we get to you, Inmate Palacios,

24   I'd like you to give your inmate number as well,

25   okay?

26       **INMATE PALACIOS:**  Okay.

27       **PRESIDING COMMISSIONER SAWYER:**  I'll

2

1   start with me, Tom Sawyer, S-A-W-Y-E-R,

2   Commissioner.

3        **DEPUTY COMMISSIONER KEENAN:**  Bill Keenan,

4   K double E, N-A-N, Deputy Commissioner.

5        **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

6   T-A-R-D-I double F, attorney for Mr. Palacios.

7        **INMATE PALACIOS:**  Edward Palacios,

8   P-A-L-A-C-I-O-S, D-27035.

9        **PRESIDING COMMISSIONER SAWYER:**  Thank you

10  very much.  There's also two correctional peace

11  officers in the room who are here for security

12  purposes.  I'm showing accommodation for

13  disabilities for, let's see.  The record

14  reflects that you signed a BPT Form 1073, which

15  is a Reasonable Accommodation Notice and Request

16  in accordance with the provisions of the

17  Americans with Disabilities Act --

18                  (Off the record.)

19       **DEPUTY COMMISSIONER KEENAN:**  This should

20  be the generator and it's going to switch back

21  one more time.  Sometimes it's seamless and

22  sometimes it does that whole thing again.

23       **ATTORNEY TARDIFF:**  So we should not start

24  again, right?

25       **DEPUTY COMMISSIONER KEENAN:**  I'll put

26  this on pause.

27       **PRESIDING COMMISSIONER SAWYER:**  Put it on

3

1   pause.

2        **DEPUTY COMMISSIONER KEENAN:**  Back on

3   record.

4        **PRESIDING COMMISSIONER SAWYER:**  Back on

5   record.  We had a brief power failure.  We're

6   back on record at ten after nine a.m. and I'll

7   start over again to make sure we get this into

8   the record in regards to the ensuring

9   accommodation for disabilities.  The record

10  reflects that you signed BPT form 1073, which is

11  a Reasonable Accommodation Notice and Request in

12  accordance with the provisions of the Americans

13  with Disabilities Act and that was signed on

14  7/7/04.  Counsel, here is the form.

15  (Inaudible).

16       **ATTORNEY TARDIFF:**  Yes.

17       **PRESIDING COMMISSIONER SAWYER:**  You

18  indicated you do not have an disabilities; is

19  that true, Mr. Palacios?

20       **INMATE PALACIOS:**  Yes, it's true.

21       **PRESIDING COMMISSIONER SAWYER:**  And this

22  information is still current and correct?

23       **INMATE PALACIOS:**  Yes.

24       **PRESIDING COMMISSIONER SAWYER:**  The

25  information that you do not have any

26  disabilities.

27       **INMATE PALACIOS:**  Right, yes.

4

1      **PRESIDING COMMISSIONER SAWYER:**  Very

2  good.  Counsel, I'll ask if you will waive the

3  rest of the disability procedures.

4      **ATTORNEY TARDIFF:**  Yes.

5      **PRESIDING COMMISSIONER SAWYER:**  Thank you

6  very much.  Okay, I'll outline the hearing

7  procedures, Mr. Palacios.  This hearing is being

8  conducted pursuant to Penal Code Sections 3041,

9  3042, and the rules and regulations of the Board

10  of Prison Terms governing parole consideration

11  hearings for life inmates.  The purpose of

12  today's hearing is to consider your suitability

13  for parole.  In doing so we will consider the

14  number and nature of the crimes you were

15  committed for, your prior criminal and social

16  history and your behavior and programming since

17  your commitment.  We also had the opportunity to

18  review your Central File and your prior hearing

19  transcript.  You'll be given an opportunity to

20  correct and clarify the record.  We will

21  consider your progress since your last

22  commitment and since your last hearing.  Your

23  updated counselor's report and your

24  psychological report will also be considered.

25  Any change in parole plans should be brought to

26  our attention.  We will reach a decision today

27  and inform you whether or not we find you

5

1    suitable for parole and the reasons for our

2    decision.  If you are found not (sic) suitable

3    for parole the length of your confinement will

4    be explained to you.  This hearing will be

5    conducted in two phases.  I will discuss with

6    you the crime that you were committed for, your

7    prior criminal and social history, your parole

8    plans and any letters of support or opposition

9    that may be on file.  Deputy Commissioner Keenan

10   will discuss with you your progress since your

11   commitment, your counselor's report and your

12   psychological evaluation.  Once this is

13   concluded the Commissioners, the district

14   attorney, who is, for the record, Debra

15   Archuleta.  Debra Archuleta is not here due to

16   an illness this morning, will be given an

17   opportunity to ask you questions if the district

18   attorney does show up.

19        **INMATE PALACIOS:**  Okay.

20        **PRESIDING COMMISSIONER SAWYER:**  Okay?

21   Before we recess for deliberations the district

22   attorney, your attorney, and you will be given

23   an opportunity to make a final statement

24   regarding your parole suitability.  Your

25   statement should be directed as to why you feel

26   you are suitable for parole.  We will recess and

27   clear the room for deliberations.  Once we have

6

1  completed our deliberations we will resume the
2  hearing and announce our decision.  The
3  California Code of Regulations states that
4  regardless of time served a life inmate shall be
5  found unsuitable for parole and denied parole if
6  in the judgment of the panel the inmate would
7  pose an unreasonable risk of danger to society
8  if released from prison.  You have certain
9  rights.  These rights include the right to a
10 timely notice of this hearing, the right to
11 review your Central File and the right to
12 present relevant documents.  Counselor, have
13 your inmate's rights been met?
14    **ATTORNEY TARDIFF:**  Yes they have.
15    **PRESIDING COMMISSIONER SAWYER:**  Also you
16 have the right to be heard by an impartial
17 panel.  Counsel, do you have any objection to
18 the panel?
19    **ATTORNEY TARDIFF:**  I don't.
20    **PRESIDING COMMISSIONER SAWYER:**  You will
21 receive a copy of our written tentative decision
22 today.  That decision is subject to review by
23 the Decision Review Unit and by the entire Board
24 meeting as a body.  It will become effective
25 within 120 days.  It will also be subject to
26 review by the Governor.  A copy of the tentative
27 decision and a copy of the transcript will be

7

1  sent to you.  As of May 1st, 2004, there were
2  major changes limiting your former rights to
3  appeal Board decisions or actions directly to
4  the Board.  The old Board regulations were
5  repealed.  The current policy is entitled
6  Administrative Appeals Correspondence and
7  Grievances Concerning Board of Prison Terms
8  Decisions.  It is available at your prison
9  library or through your attorney.
10         **INMATE PALACIOS:**  Okay.
11         **PRESIDING COMMISSIONER SAWYER:**  You are
12  not required to admit your offense or discuss
13  your offense if you do not wish to do so.
14  However, this panel does accept as true the
15  findings of the court and you are invited to
16  discuss the facts and circumstances of this
17  offense if you desire.  The Board will review
18  and consider any prior statements you have made
19  regarding the offense in determining your
20  suitability for parole.  Commissioner, do we
21  have any confidential material that will be used
22  in today's hearing?
23         **DEPUTY COMMISSIONER KEENAN:**  There is a
24  confidential file; it may be used.
25         **PRESIDING COMMISSIONER SAWYER:**  The
26  hearing checklist.  Counsel, I have a hearing
27  checklist for you to check against your

8

1  checklist of your documents.

2      **ATTORNEY TARDIFF:**  I have all of those

3  documents?

4      **PRESIDING COMMISSIONER SAWYER:**  Okay.

5  Will the inmate be speaking to us today?

6      **ATTORNEY TARDIFF:**  Yes.

7      **PRESIDING COMMISSIONER SAWYER:**  Okay,

8  thank you.  If that's correct please raise your

9  right hand, Mr. Palacios.  Do you solemnly swear

10  or affirm that the testimony you give at this

11  hearing will be the truth, the whole truth and

12  nothing but the truth?

13      **INMATE PALACIOS:**  Yes.

14      **PRESIDING COMMISSIONER SAWYER:**  Okay.

15  This is the inquiry into the facts of the crime,

16  the criminal record, the personal history --

17      **ATTORNEY TARDIFF:**  He doesn't want to

18  discuss the commitment offense.  But he'll be

19  willing to discuss everything else.

20      **PRESIDING COMMISSIONER SAWYER:**  So you

21  don't want to discuss the commitment offense?

22      **INMATE PALACIOS:**  No I do not.

23      **PRESIDING COMMISSIONER SAWYER:**  Will you

24  discuss your version of the offense?

25      **INMATE PALACIOS:**  No, I don't want to

26  discuss anything.  But I would like to stipulate

27  to the official reports.

9

1      **PRESIDING COMMISSIONER SAWYER:**  Okay,

2  then I'm going to read them into the record.

3      **INMATE PALACIOS:**  Okay.

4      **PRESIDING COMMISSIONER SAWYER:**  Okay?

5  I'm going to read the summary of the crime and

6  the prisoner's version.

7      **INMATE PALACIOS:**  Okay.

8      **PRESIDING COMMISSIONER SAWYER:**  And this

9  is being read from the Subsequent Parole

10  Consideration Hearing of 2003 calendar Board

11  Report, page 11.  Summary of the crime.  "At

12  approximately 1:40 a.m. on September 2nd, 1985

13  victim Eddie --"

14      **INMATE PALACIOS:**  Angulo.

15      **PRESIDING COMMISSIONER SAWYER:**  "Angulo,

16  17 --"  And that's spelled A-N-G-U-L-O.

17          "-- 17, was spending time with his

18          acquaintances at Lennox Park.  A

19          truck driven by Edward Palacios

20          and codefendants Carlos Soto and

21          Robert Sanden --"

22  That's Soto, S-O-T-O, and Sanden, S-A-N-D-E-N.

23          "-- drove by.  Someone in the

24          truck yelled out asking, where are

25          you from?  A verbal confrontation

26          ensued.  The occupants of the

27          truck exited their vehicle and

10

1        began fighting with the victim,

2        Sanden and Soto using a baseball

3        bat to assault the victim.

4        Palacios stabbed the victim with a

5        knife.  After the stabbing the

6        assailants drove off and the

7        victim was rushed to Daniel

8        Freeman Hospital where he died

9        later the following week.  The

10       cause of death was determined to

11       be a myocardial infarction due to

12       a stab wound penetrating the heart

13       and entering the right coronary

14       artery.  The subject was arrested

15       as a result of the officer's

16       investigation."

17   The prisoner's version.

18       "Palacios states that he's truly

19       sorry for his role in the tragedy

20       involving Eddie Angulo.  He states

21       that this involved many people in

22       Eddie's family as well as his own

23       family.  He firmly believes that

24       his abuse of drugs and his young

25       age played a major part in this

26       tragedy.  He stated there are no

27       words that he could say that would

11

1    express his sorrow and to feel the
2    impact of having taken someone's
3    else's life every day."
4    Page two of the same report reading under pre-
5    conviction factors, juvenile record.  Hawthorne
6    PD arrest 5/24 of '79 for 459 burglary.  Placed
7    on probation for one year.  Los Angeles County
8    Sheriff's Office arrest 2/4 of '80 for 12020(a),
9    possession of a dangerous weapon.  Subject was
10   released due to insufficient evidence.
11   Hawthorne PD arrest 5/7/2001 (sic) felony hit
12   and run and 148 resisting arrest.  Subject was
13   counseled and released.  Hawthorne PD arrests
14   7/27 of 1980 for BMP minor in possession of
15   alcohol.  Subject counseled and released.  Los
16   Angeles County Sheriff's Office arrest 3/10 of
17   '81 for 488 PC petty theft.  Petition requested,
18   no more charges on file.  Los Angeles County
19   Sheriff's Office 6/20 of '81 for 637(f) drunk in
20   public.  Petition requested, disposition
21   unknown.  That was your juvenile record.  Adult
22   convictions, none.  We'll go on to personal
23   factors.  Palacios was born October 14th, 1964,
24   the eighth of nine children born to the union of
25   Jose Palacios and Lupe Maria Gonzalez in Los
26   Angeles, California.  His parents separated when
27   he was about 13 years old, being raised

12

1  exclusively by his mother.  His father died in
2  1986 of unknown causes.  He dropped out of
3  school in the tenth grade and began
4  experimenting with drugs, PCP and alcohol.  He
5  was employed as a shipping clerk and worked fast
6  food.  He was married to the former Monica
7  Jaramilla, J-A-R-A-M-I-L-L-A, in Los Angeles
8  County Jail though they have been divorced now
9  for a long time.  After reading your juvenile
10  record do you have any comments or questions
11  about your juvenile history?

12      INMATE PALACIOS:  No, no.

13      PRESIDING COMMISSIONER SAWYER:  It seems
14  to kind of come '79, '80, '80, '80, '81, '81,
15  one thing after another.

16      INMATE PALACIOS:  Yeah, I was a kid.  I
17  was a kid growing up being a follower.  That's
18  what we did.  We ran around and got drunk and
19  stealing, you know.  That's what we did.  I was
20  just a misfit child.

21      PRESIDING COMMISSIONER SAWYER:  In that
22  arrest in 1980.  How old were you in '80?  You
23  were born in 19 --

24      INMATE PALACIOS:  Sixteen.

25      PRESIDING COMMISSIONER SAWYER:  Sixteen.
26  Did you have a driver's license?

27      INMATE PALACIOS:  No.  I wasn't actually

13

1  the driver, I was a passenger.  The hit and run

2  occurred.  I think I have it.  I was actually a

3  passenger.  A hit and run occurred.  We got in

4  an accident, we all jumped out, we ran.  The

5  driver stood there and took responsibility for

6  his driving.  But we were kids, we took off.

7  And later on -- A police officer seen it.  He

8  happened to see it and he pursued us and he

9  arrested us.  But I wasn't the driver.

10        PRESIDING COMMISSIONER SAWYER:  Okay.

11  Was the car stolen?

12        INMATE PALACIOS:  No.  It belonged to the

13  driver.

14        PRESIDING COMMISSIONER SAWYER:  The

15  driver have a license?

16        INMATE PALACIOS:  I'm not sure.

17        PRESIDING COMMISSIONER SAWYER:  What kind

18  of injuries did the people suffer that he hit?

19        INMATE PALACIOS:  He broke a leg, he

20  broke his legs.  I don't know.

21        PRESIDING COMMISSIONER SAWYER:  Did he

22  get time for that?

23        INMATE PALACIOS:  I have no idea.

24        PRESIDING COMMISSIONER SAWYER:  Did you

25  (inaudible)?

26        INMATE PALACIOS:  No, I don't think it

27  was.

14

1      **PRESIDING COMMISSIONER SAWYER:**  Tell me

2  about the minor in possession.  What kind of

3  alcohol did you have?

4      **INMATE PALACIOS:**  Just beer.  We were

5  drinking, just drinking in public.

6      **PRESIDING COMMISSIONER SAWYER:**  And

7  that's 16 years of age too.

8      **INMATE PALACIOS:**  Uh-huh.

9      **PRESIDING COMMISSIONER SAWYER:**  And the

10  petty theft, what was that?  What did you steal?

11      **INMATE PALACIOS:**  I think it was some

12  shoe shine, shoe shine.

13      **PRESIDING COMMISSIONER SAWYER:**  Shoe

14  shine?

15      **INMATE PALACIOS:**  Yeah, out of a market.

16      **PRESIDING COMMISSIONER SAWYER:**  Didn't

17  have any money?

18      **INMATE PALACIOS:**  I could get it free.  I

19  tried to get it free.

20      **PRESIDING COMMISSIONER SAWYER:**  Tried to

21  get it free, okay.  So that was shine for your

22  shoes?

23      **INMATE PALACIOS:**  Yeah, shine for my

24  shoes.

25      **PRESIDING COMMISSIONER SAWYER:**  Pretty

26  good shiny shoes back then?

27      **INMATE PALACIOS:**  Back then, yeah I

15

1  guess.  I tried to keep them shiny, keep them

2  clean.

3        **PRESIDING COMMISSIONER SAWYER:**  Kids

4  today don't know how to shine shoes.

5        **ATTORNEY TARDIFF:**  Or tie shoelaces.

6        **PRESIDING COMMISSIONER SAWYER:**  Yeah.  Or

7  drive stick shifts.  Then in 1981 when you were

8  17 or so you got a drunk in public, 637(f).  How

9  drunk were you?

10        **INMATE PALACIOS:**  Drunk enough to have

11  them arrest me.

12        **PRESIDING COMMISSIONER SAWYER:**  Were you

13  belligerent too?

14        **INMATE PALACIOS:**  Belligerent, I don't

15  think I was.

16        **PRESIDING COMMISSIONER SAWYER:**  You don't

17  remember?

18        **INMATE PALACIOS:**  The '81.  I know at

19  that time we were in a residence neighborhood.

20  So we got loud, people complained and they came

21  and arrested us.

22        **PRESIDING COMMISSIONER SAWYER:**  Hanging

23  out being rowdy?  Okay.  It says in here under

24  your personal factors that your father was

25  killed -- died in 1986.  Do you know what he

26  died of?

27        **INMATE PALACIOS:**  Well he was killed.  He

16

1    was shot in the chest in '86, December 13th.  I

2    think he was being robbed, trying to be robbed,

3    and he wouldn't give them his money so they shot

4    him.

5         **PRESIDING COMMISSIONER SAWYER:**  And that

6    was shortly after you got (inaudible).

7         **INMATE PALACIOS:**  Right.

8         **PRESIDING COMMISSIONER SAWYER:**  Did that

9    have an impact you, when your father died?

10        **INMATE PALACIOS:**  Yes, greatly, yeah.  I

11   might have not -- I mean, I was probably

12   separating for awhile but, I mean, I grew up

13   with, you know.  Since I was a kid we watched

14   ball games, we watched soccer together.  So when

15   I lost him it did have an impact.

16        **PRESIDING COMMISSIONER SAWYER:**  Is that

17   what you mean in here about -- In your statement

18   -- And I know you don't want to talk about this

19   and you don't have to, but I'm trying to get

20   some insight from you.

21        **INMATE PALACIOS:**  Right.

22        **PRESIDING COMMISSIONER SAWYER:**  So you

23   lost your dad.  And just before that, before you

24   lost your dad, you took another life.  And you

25   expressed that words cannot say how to express

26   the sorrow.  You impacted another family.

27   (Inaudible) Eddie.

17

1        **INMATE PALACIOS:**  That was prior to my

2    father's death.

3        **ATTORNEY TARDIFF:**  No, but he's asking

4    you how you could relate to that.

5        **PRESIDING COMMISSIONER SAWYER:**  I'm

6    looking at your insight.  Here you killed Eddie

7    then your father was killed.

8        **INMATE PALACIOS:**  Right.

9        **PRESIDING COMMISSIONER SAWYER:**  Could you

10   then empathize --

11       **INMATE PALACIOS:**  Absolutely, absolutely.

12       **PRESIDING COMMISSIONER SAWYER:**  Empathize

13   with the family of the victim?

14       **INMATE PALACIOS:**  Absolutely I could.  I

15   took Impact and I remember one week that two

16   mothers came to speak to us.  They talked about

17   how they lost their children.  I mean, and I

18   seen it was through gang violence.  And I seen

19   that, you know, while they were telling us this

20   story that they were holding back tears and

21   crying and holding back their tears and I just

22   realized.  I mean, it hit me right then that

23   that was Eddie's mother, that was Eddie's

24   mother, I could see Eddie's mother.  That image

25   plus when my father passed away.  So I know the

26   impact my actions had towards people and I know

27   how I feel.  You know, it was tragic and it's

18

1   something I won't forget.

2        **PRESIDING COMMISSIONER SAWYER:**  Are you

3   called Eddie at all or Edward?

4        **INMATE PALACIOS:**  Eddie.

5        **PRESIDING COMMISSIONER SAWYER:**  Eddie.

6        **INMATE PALACIOS:**  Yes.

7        **PRESIDING COMMISSIONER SAWYER:**  You're

8   called Eddie too?

9        **INMATE PALACIOS:**  Yeah.

10        **PRESIDING COMMISSIONER SAWYER:**  And your

11   victim was also named Eddie.

12        **INMATE PALACIOS:**  Yes he was.

13        **PRESIDING COMMISSIONER SAWYER:**  So you

14   kind of became one and the same didn't you?

15        **INMATE PALACIOS:**  Yes, he'll be part of

16   my life the rest of my life.

17        **PRESIDING COMMISSIONER SAWYER:**  Why do

18   they call you Clown?

19        **INMATE PALACIOS:**  That's a long story.

20        **PRESIDING COMMISSIONER SAWYER:**  Can you

21   make it brief?

22        **INMATE PALACIOS:**  Well, when I was

23   growing up my brother was called Payaso, Clown

24   in Spanish.  And when I was growing up I looked

25   up to this guy.  And as I was growing up,

26   everybody realizing that I was his younger

27   brother, so they began to call me Little Payaso,

19

1    Little Clown.  So as I grew up that name stuck

2    to me.  And today I realize that that's not even

3    who I am.  I'm no comedian, you know.  But I

4    lived the life that I was expected to, you know.

5    It was like --

6            **PRESIDING COMMISSIONER SAWYER:**  You were

7    expected by your brothers to be a clown?

8            **INMATE PALACIOS:**  My brother, by my

9    community.  I mean, where I grew up,

10   unfortunately there was a subculture that

11   existed.

12           **PRESIDING COMMISSIONER SAWYER:**  Okay.

13   Did you say code or culture?

14           **INMATE PALACIOS:**  Culture.

15           **PRESIDING COMMISSIONER SAWYER:**  Culture.

16           **INMATE PALACIOS:**  A culture that existed.

17   You know, it was a gang lifestyle.  I mean, as

18   we grew up we were expected to join, to be part

19   of that culture.  You know, I mean, gangs, they

20   don't have any -- Gangs, they don't care what

21   ethnicity you are, your age or your race.  I

22   mean, whoever is available for them they'd

23   accept.  And I just grew up in that environment

24   and it was like I had to participate.  That was

25   just expected of me because of the influence of

26   my brother.

27           **PRESIDING COMMISSIONER SAWYER:**  It says

20

1  you're the eighth of nine children.

2          **INMATE PALACIOS:**  Yes.

3          **PRESIDING COMMISSIONER SAWYER:**  Did you

4  have sisters too?

5          **INMATE PALACIOS:**  Yes.

6          **PRESIDING COMMISSIONER SAWYER:**  Were they

7  gang members?

8          **INMATE PALACIOS:**  No.

9          **PRESIDING COMMISSIONER SAWYER:**  What

10  happened there?

11          **INMATE PALACIOS:**  Well, because I guess

12  my brother was being a male, and I'm being male

13  right under him, so I hung out in the places he

14  did.  My sisters, they hung out in different

15  spots so they really -- You know, we went to the

16  same school and they knew everything, you know.

17  But as far as -- There was no gang, female

18  gangs.  Back then the females weren't really too

19  much accepted to be part of the gang.  It was

20  more male-dominated.

21          **PRESIDING COMMISSIONER SAWYER:**  More

22  machismo.

23          **INMATE PALACIOS:**  Exactly.

24          **PRESIDING COMMISSIONER SAWYER:**  Now tell

25  me about your brothers.  Are they still alive?

26          **INMATE PALACIOS:**  Yes, all my brothers

27  are alive.  My brother, fortunately, he got

21

1  married.  He got married like at 20 years old
2  and he's living his life out there.
3       PRESIDING COMMISSIONER SAWYER:  And are
4  your brothers still active in gangs?
5       INMATE PALACIOS:  No, no.  I just had one
6  brother who was, that I always looked up to.  He
7  was directly older than me with two sisters in-
8  between.  But the other brothers they never,
9  they never were involved.  But they were already
10  older.  They were like the oldest in the family
11  so it was like I really didn't bond with them
12  too much.  Because they were older and they had
13  their girlfriends and they lived their life.
14  But I think my biggest influence was my brother,
15  the one that's right above me.  But they're all
16  living out there, they have their families,
17  married.
18       PRESIDING COMMISSIONER SAWYER:  Have you
19  gone through any kind of debriefing process?
20       INMATE PALACIOS:  No.
21       PRESIDING COMMISSIONER SAWYER:  From the
22  gang?
23       INMATE PALACIOS:  No.
24       PRESIDING COMMISSIONER SAWYER:  Are you a
25  member of any gang inside?
26       INMATE PALACIOS:  No, no gangs.
27       PRESIDING COMMISSIONER SAWYER:  No

22

1  affiliations at all?

2      **INMATE PALACIOS:**  No affiliations.

3      **PRESIDING COMMISSIONER SAWYER:**  Do you

4  still hang with the Clown moniker?

5      **INMATE PALACIOS:**  No.

6      **PRESIDING COMMISSIONER SAWYER:**  Nobody

7  calls you Clown here?

8      **INMATE PALACIOS:**  Yes, some people call

9  me.  Of course being in prison people come in,

10  they know you and they refer to you as that.

11  But that's like right on the side.  But being my

12  every day going to the job, but at my work they

13  call me Eddie.  I prefer them to call me Eddie.

14      **PRESIDING COMMISSIONER SAWYER:**  Okay.

15  Let's talk about your future plans, residence.

16  You have a standing offer to live with your

17  sister Reyna Palacios.  And I received a letter

18  today from Veronica Trujillo, she's your niece.

19      **INMATE PALACIOS:**  Yes.

20      **PRESIDING COMMISSIONER SAWYER:**  She lives

21  in Ontario, California.  Help him gain resources

22  to establish his economic stability.  You're

23  welcome to stay with her.  Unfortunately,

24  Ontario is in San Bernardino County or

25  Riverside.  Riverside County?

26      **ATTORNEY TARDIFF:**  Which one, which city?

27      **PRESIDING COMMISSIONER SAWYER:**  Ontario.

23

1          **ATTORNEY TARDIFF:**  San Bernardino I
2   think.
3          **PRESIDING COMMISSIONER SAWYER:**
4   (Inaudible).
5          **ATTORNEY TARDIFF:**  Yeah.
6          **PRESIDING COMMISSIONER SAWYER:**  It's not
7   LA.
8          **ATTORNEY TARDIFF:**  No.
9          **PRESIDING COMMISSIONER SAWYER:**  Okay.
10  But she's there to support you.  Also I have a
11  letter from your sister Reyna Palacios in
12  Southgate, which is in LA County.  And your
13  sister Virginia Calderone, C-A-L-D-E-R-O-N-E,
14  Paramount, California.  So you have got two
15  sisters that will take you in.
16         **INMATE PALACIOS:**  Yes.  I have a letter
17  from my sister Virginia also.
18         **PRESIDING COMMISSIONER SAWYER:**  Okay.
19  Your sister Virginia.  Another sister?
20         **INMATE PALACIOS:**  Yes.
21         **PRESIDING COMMISSIONER SAWYER:**  To whom
22  it may concern.  I am writing this letter on
23  behalf of my brother Eduardo.
24         **INMATE PALACIOS:**  Yes, she calls me by my
25  Spanish name.
26         **PRESIDING COMMISSIONER SAWYER:**  Who is an
27  inmate.  This letter is to verify that Edward

24

1  Palacios can come live with me.  And she's in

2  the same neighborhood as -- No, wait a minute.

3  She lives with -- This is Virginia?

4        **INMATE PALACIOS:**  Right.

5        **PRESIDING COMMISSIONER SAWYER:**  Okay,

6  this is verifying what I (overlapping).

7        **INMATE PALACIOS:**  Paramount, right.

8  Paramount, California.

9        **PRESIDING COMMISSIONER SAWYER:**

10  Paramount, okay.  And this is dated 7/12/05,

11  very good.  I noticed on the previous Board

12  Hearing they said they needed you to firm up

13  some parole plans.

14        **INMATE PALACIOS:**  Yes.  My letters hadn't

15  arrived yet.  But I have those too.  They

16  arrived, I've got them now.

17        **PRESIDING COMMISSIONER SAWYER:**  Are they

18  the same letters?

19        **INMATE PALACIOS:**  The same people.

20        **PRESIDING COMMISSIONER SAWYER:**  There are

21  no changes here?

22        **INMATE PALACIOS:**  No, no.

23        **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

24  this is consistent.  Employment.  Palacios has

25  four years of experience working as an optician

26  at the PIA optics lab in San Diego at Donovan.

27        **INMATE PALACIOS:**  Right.

25

 1          **PRESIDING COMMISSIONER SAWYER:**  You also

 2   worked as a certified final inspector and helped

 3   to train other inmates in optics.  Completed a

 4   vocational printing program, which includes

 5   extensive work in the graphics arts field.  His

 6   education progress report under 6/00 states:

 7   Palacios is skilled as a large press operator.

 8          **INMATE PALACIOS:**  Right.

 9          **PRESIDING COMMISSIONER SAWYER:**  Is that

10   still good even though it's five years old?

11          **INMATE PALACIOS:**  Yes, yes.

12          **PRESIDING COMMISSIONER SAWYER:**  Okay.

13   Have you done any more graphic arts or printing

14   since the year 2000?

15          **INMATE PALACIOS:**  No, no.  Right now I'm

16   in the PIA furniture factory.

17          **PRESIDING COMMISSIONER SAWYER:**

18   Furniture?

19          **INMATE PALACIOS:**  Yes.

20          **PRESIDING COMMISSIONER SAWYER:**  Okay.

21   Commissioner Keenan in a moment will take care

22   of some of those things.  Assessment:

23   Mr. Palacios has two certified vocational skills

24   that he can apply for employment upon release.

25   He has offers of support in living

26   accommodations with two different sisters.

27          **ATTORNEY TARDIFF:**  Is the tape still

26

1  going?

2      **DEPUTY COMMISSIONER KEENAN:**  We're still

3  on record.

4      **PRESIDING COMMISSIONER SAWYER:**  A little

5  power fluctuation there.  We have also noted in

6  the Central File that it says you have support

7  from family members.  Palacios states that he

8  will have updated letters, which he has come in

9  with an updated letter, two updated letters.  I

10  also have a letter in response to the 3042

11  notices that we send out to every agency.

12  They're sent out to the court, to the sheriff's

13  department, to any agency that was involved, the

14  probation department.  Any agency that was

15  involved with your crime.  And we have a letter

16  here that was in the C file.  It was received

17  February 28th of 2005.  They talk about -- It's

18  from the County of Los Angeles Sheriff's

19  Department.  They talk about the crime.  They

20  talk about the death.  Based on the facts of the

21  case it's the opinion of this department that

22  parole of Inmate Palacios is inappropriate and

23  should be denied.  It's signed by Raymond H.

24  Peavy, P-E-A-V-Y, Captain Homicide Bureau.

25  That's in your C file in response to a notice.

26  Do you have any other letters?  I'll give you an

27  opportunity at this point to talk about -- Tell

27

1  me about your vocation.  I read somewhere, it

2  wasn't in the summary, but I read somewhere

3  where you have some sort of certificate as an

4  optician.

5       **INMATE PALACIOS:**  Right, American Board

6  of Optics.  When I was there I was actually

7  working in the production side.  The school

8  where they taught was in a different yard.  But

9  I would make the trip to get the books and teach

10  myself.  Along with -- There was about five of

11  us, you know.  We had a little group and we

12  taught ourselves.  So, you know, we did all the

13  studying.  The day they came for the test we

14  were let go to the opposite yard and we took the

15  test there.  But it's the certification for the

16  American Board of Optics.  I have a license to

17  dispense lenses, manufacture, final inspect

18  them.

19       **PRESIDING COMMISSIONER SAWYER:**  Do we

20  have that certificate?

21       **INMATE PALACIOS:**  It should be in my C

22  file.

23       **PRESIDING COMMISSIONER SAWYER:**  Okay.

24       **INMATE PALACIOS:**  I don't have it here.

25       **PRESIDING COMMISSIONER SAWYER:**  Do you

26  have a copy of it?  Did you see it?

27       **DEPUTY COMMISSIONER KEENAN:**  I saw a

28

1   reference to it in past Board Reports and the
2   current Board Report.  I haven't seen the
3   certificate yet.  I suspect it's in there but I
4   haven't looked at the certificates.
5           INMATE PALACIOS:  It should be in there.
6           PRESIDING COMMISSIONER SAWYER:  And you
7   took the test just one time?
8           INMATE PALACIOS:  Yeah, one time.
9           PRESIDING COMMISSIONER SAWYER:  So this
10  gives you, this puts you at the same level as
11  the Jones Optics down the street that dispenses
12  lenses?
13          INMATE PALACIOS:  Lenscrafters, all those
14  guys.  The same work they do, I'm able to do
15  that.  I could -- I could make the lenses, cut
16  them out, mount them on your lens, check the
17  power and dispense them to the client.
18          PRESIDING COMMISSIONER SAWYER:  Do the
19  work (overlapping).
20          ATTORNEY TARDIFF:  He may need some new
21  work glasses, I think.
22          PRESIDING COMMISSIONER SAWYER:  You
23  should be commended for that.
24          INMATE PALACIOS:  Thank you.
25          PRESIDING COMMISSIONER SAWYER:  Post-
26  conviction factors.  Deputy Commissioner Keenan
27  will go into the post-conviction factors.

29

1          **DEPUTY COMMISSIONER KEENAN:**  Okay.

2    Mr. Palacios, I see you were received back on

3    3/31/86.  You have a placement score of 19.  It

4    was a classification score of zero as far as

5    4/6/93.  The last hearing was on 11/5/03, that

6    was a stipulated one year denial.  We

7    recommended you remain disciplinary-free, which

8    you have, and participate in self-help and

9    therapy, and I'll get into some more detail on

10   that as we go forward here.  In terms of your

11   disciplinary history you have no 128(a)s, you

12   have one 115.  That was back on 12/10/90, an

13   administrative 115 for theft of state food.

14   Everything sound right so far?

15          **INMATE PALACIOS:**  Yes.

16          **DEPUTY COMMISSIONER KEENAN:**  Okay.  All

17   right.  And I'll focus on the Board Report here

18   prepared for this hearing by K. Hilliard,

19   H-I-L-L-I-A-R-D, Correctional Counselor I, dated

20   9/29/04.  And in the section on post-conviction

21   factors the counselor notes, as you have already

22   indicated, that you're assigned to PIA furniture

23   factory.  There was a work supervisor report

24   indicating that you exhibit good work habits and

25   need very little supervision.  You received

26   above average and satisfactory ratings.  And in

27   the section under therapy and self-help

30

1  activities it says: Since the last hearing
2  Palacios has continued to participate in
3  Alcoholics and Narcotics Anonymous.  He also
4  participated in a three hour video discussion in
5  the Inmate Employability Program learning how to
6  identify and control antisocial behavior and how
7  to correctly seek employment opportunities.  And
8  he confirms what I just mentioned already about
9  the disciplinary history.  Okay.  And he also
10 notes in the report you have certified
11 vocational skills.  Optician and large press
12 operator.  That's part of graphic arts, right?
13         INMATE PALACIOS:  Right.
14         DEPUTY COMMISSIONER KEENAN:  Graphic
15 arts, large press operator.
16         INMATE PALACIOS:  Right.
17         DEPUTY COMMISSIONER KEENAN:  And I
18 believe I saw a notation somewhere in the C file
19 for completion on that.
20         INMATE PALACIOS:  Right.
21         DEPUTY COMMISSIONER KEENAN:  You've
22 completed both?
23         INMATE PALACIOS:  Both.
24         DEPUTY COMMISSIONER KEENAN:  Okay.  This
25 is what it says in the educational progress
26 report back in 6/30 of '00.  This is from
27 Instructor K. Eng.

31

1          INMATE PALACIOS:  Yes.

2          DEPUTY COMMISSIONER KEENAN:  E-N-G, okay.

3    Completed the program.  It says, he is skilled

4    and employable as a large press operator.  He

5    has received all high school credits with a

6    grade of A.  Okay.  I'm not entirely sure what

7    that means?  Have you finished high school?

8          INMATE PALACIOS:  No, no.

9          DEPUTY COMMISSIONER KEENAN:  Where are

10   you at on that?  Are you trying to work toward a

11   GED or?

12         INMATE PALACIOS:  I've completed my GED.

13         DEPUTY COMMISSIONER KEENAN:  Okay, that's

14   right.  I thought I saw something about a GED in

15   there, okay.  All right.  And I also see the

16   chrono from back in '93 about you being a

17   certified optician it says.

18         INMATE PALACIOS:  Right.

19         DEPUTY COMMISSIONER KEENAN:  Okay.  Okay.

20   And the correctional counselor recommends that

21   you continue to remain disciplinary-free and

22   participate in self-help when it's available

23   prior to your release.  And the attached post-

24   conviction progress reports are telling me

25   basically the same thing.  Maybe a little more

26   detail on some of it.  It says you successfully

27   completed the first series of 15 educational

32

1  video reports and should be commended for his

2  outstanding work.  Did you finish that?  It --

3        **ATTORNEY TARDIFF:**  It's a --

4        **DEPUTY COMMISSIONER KEENAN:**  Excuse me.

5        **ATTORNEY TARDIFF:**  It's a series of video

6  that they get through the TV, right?  And it's

7  just ongoing.

8        **DEPUTY COMMISSIONER KEENAN:**  Is that part

9  of that Inmate Employability Program?

10        **ATTORNEY TARDIFF:**  No.  It's more

11  educational.

12        **DEPUTY COMMISSIONER KEENAN:**  Okay.

13        **ATTORNEY TARDIFF:**  Right?

14        **INMATE PALACIOS:**  Right.

15        **DEPUTY COMMISSIONER KEENAN:**  All right.

16  I also went back through some of the past Board

17  Reports and I saw that you have worked as a cook

18  in culinary, participated in anger management,

19  were participating in the Impact program.  Did

20  you finish that?

21        **INMATE PALACIOS:**  Yes.

22        **DEPUTY COMMISSIONER KEENAN:**  Okay.  It

23  says you planned to get involved in vocational

24  computer repair.  Did you ever do that?

25        **INMATE PALACIOS:**  No, they shut it down.

26  It got shut down.

27        **DEPUTY COMMISSIONER KEENAN:**  Okay.  And

33

```
1   it does mention your GED.  You passed that back
2   in '89.  It indicates here you completed a 26
3   hour Alternative to Violence program.  That was
4   back in '89.  Let's see.  You also completed
5   Breaking Barriers and mention again of your work
6   in AA.  I think I saw some notations like in
7   psychological evaluation I'll get to in a minute
8   about you being in AA since '94.  That's
9   incorrect, I see you were in it since '90.
10          INMATE PALACIOS:  I've been going
11   constantly since '94 since I've been here in
12   Soledad.  But I've going way back.
13          DEPUTY COMMISSIONER KEENAN:  Since '90
14   from what I can tell in past Board Reports.
15          INMATE PALACIOS:  It might be earlier
16   than that.
17          DEPUTY COMMISSIONER KEENAN:  It might be
18   earlier?  Okay.  The first one I think I noticed
19   was '90.  Okay.  Am I missing anything?
20   Everything sounds accurate so far?
21          INMATE PALACIOS:  Yes.
22          ATTORNEY TARDIFF:  Well he's done Crim-
23   Anon, which is a correspondence course.  It has
24   several different areas.
25          DEPUTY COMMISSIONER KEENAN:  You know, I
26   did see some extra things in the psych report.
27          ATTORNEY TARDIFF:  And also one of these
```

34

1   psychs works with the inmates and they read a
2   self-help book and then they write a report and
3   discuss it.  That's I think basically been
4   implemented because of the lack of self-help
5   that is available.  And there's very few inmates
6   that actually participate in that but
7   Mr. Palacios did do that.
8       DEPUTY COMMISSIONER KEENAN:  Okay.  And
9   actually I saw also in the psych report, and
10  I'll get to that, something about biblical
11  correspondence courses.
12      ATTORNEY TARDIFF:  Yes.
13      INMATE PALACIOS:  Yes.
14      DEPUTY COMMISSIONER KEENAN:  And are you
15  still doing that?
16      INMATE PALACIOS:  Yes.
17      DEPUTY COMMISSIONER KEENAN:  Just sort of
18  an ongoing?
19      INMATE PALACIOS:  Yeah, ongoing.
20      DEPUTY COMMISSIONER KEENAN:  All right.
21  All right.  And I wasn't sure I heard everything
22  you had to say about gangs.  You have not
23  debriefed?
24      INMATE PALACIOS:  No.
25      ATTORNEY TARDIFF:  You don't debrief
26  unless you're part of a prison gang.
27      INMATE PALACIOS:  Right.

1      **DEPUTY COMMISSIONER KEENAN:**  Okay.

2      **ATTORNEY TARDIFF:**  If you're in a gang on

3  the streets there is no debriefing process.

4      **DEPUTY COMMISSIONER KEENAN:**  Okay.  And

5  you were in what gang on the streets?

6      **INMATE PALACIOS:**  Little Watts.

7      **DEPUTY COMMISSIONER KEENAN:**  Okay, all

8  right.  And how have you managed to avoid gang

9  involvement since you've been here?  Since

10  you've been with CDC.

11      **INMATE PALACIOS:**  I don't deal with it

12  anymore.  As far as the gangs, I don't believe

13  in that anymore.  I'm real conscious.  I'm real

14  conscious and I try to look to the future.  I

15  see a group of people hanging out, I'll go the

16  other way.  Even when I play sports.  If I feel

17  that people that I don't want to be next to are

18  around I'll take off.  I mean, I'll just do it

19  some other time.  I try to avoid -- At all costs

20  I try to avoid gangs.  I don't want nothing to

21  do with it.  I understand that that was part of

22  my problem, you know, being in gangs.  And I

23  made a decision early that I had to get my life

24  in order.  So I've been staying away from gangs,

25  I don't do drugs.

26      **DEPUTY COMMISSIONER KEENAN:**  Is it

27  difficult to avoid the gang involvement?

36

1     **INMATE PALACIOS:** Well right here, you

2  know, you live in a negative. I mean, this

3  place is packed. But I take the steps. I take

4  the steps to stay away from it.

5     **DEPUTY COMMISSIONER KEENAN:** All right.

6  I'm going to focus on the psychological

7  evaluation for this hearing prepared by --

8  Actually before I get to that I should also

9  mention there was a more recent chrono, 6/30/05,

10  again showing your participation in AA. That's

11  where I saw it. It says that you went back to

12  '94 doing that but it's further back I've seen.

13  It was at least '90. All right. And the

14  psychological evaluation was prepared by Jay

15  Steward, S-T-E-W-A-R-D, clinical psychologist.

16  And he goes over your educational history and

17  notes that you have been very proactive and

18  responsible in pursuing educational programs and

19  self-improvement opportunities available in

20  prison.

21     "He's completed Anger Management,

22     Dr. Gleason's Book Club where he

23     reads one self-help book

24     integrating concepts and self-

25     application by completing a

26     report, and Creative Options in

27     which he just sent in his last

37

```
1          lesson regarding anger management.
2          He has received certifications for
3          FEMA in Emergency and
4          Preparedness, in Animals in
5          Disasters and in Community
6          Planning.  He also completed a
7          video reporting class sponsored by
8          CTF's educational department.
9          Inmate Palacios also initiated
10         corresponding with and becoming
11         involved in Crim-Anon, a program
12         offered by L. Ron Hubbard to
13         assist inmates in understanding
14         themselves and leading more
15         productive lives.  In addition
16         Inmate Palacios initiated contact
17         with a biblical correspondence
18         school receiving a certificate in
19         his studies in 2/21/04."
20   Okay.  Then it goes on and talks about your
21   marital history, your employment and income
22   history and mentions your optician certification
23   and that you plan to find work in that area when
24   you're paroled.  It mentions also your three
25   years in offset printing and currently studying
26   furniture construction and assembly.  Under
27   substance abuse he notes that you have not used
```

38

1    alcohol or illicit drugs since your

2    incarceration and you have regularly attended

3    Alcoholics Anonymous for the last ten years.

4    And as already indicated you've attended longer

5    than that.  Okay, under current mental status

6    treatment needs.  He didn't notice any problems.

7    He did note that you had excellent insight into

8    the committing offense and "genuinely deeply

9    regrets the death of the victim, who he referred

10   to as Eddie.  His eyes turned red and about to

11   water as he discussed the senseless nature of

12   the crime.  Inmate Palacios has very good

13   judgment and very good impulse control.  This

14   truly does not appear to be the same man who was

15   incarcerated 20 years ago."  Then under

16   diagnostic impressions: Axis I, polysubstance

17   abuse in institutional remission; Axis II, none

18   noted at this time; Axis V, he notes a GAF of

19   95, global assessment functioning.  Review of

20   the life crime indicates your description of the

21   crime is consistent with the facts in the

22   probation officer's report.  It indicates you

23   are genuinely remorseful for Eddie's death,

24   wishes he could change what happened.  Some

25   inmates give lip service to grief or regret and

26   others are different.  However, Inmate Palacios

27   truly understands the scope of his actions and

39

1  tragic consequences.  Inmate Palacios' grief and

2  remorse is honest and sincere.

3          (The tape was turned over.)

4          **DEPUTY COMMISSIONER KEENAN:**  Back on

5  record, side two.  Okay.  There's a section

6  under assessment of dangerousness and he notes

7  here, "Potential for violence within a

8  controlled setting is very much significantly

9  below average relative to the inmate

10 population."  He goes on to say:

11         "If released to the community

12         Inmate Palacios' dangerousness is

13         considered to be average to below

14         average relative to the average

15         citizen.  And also the primary

16         risk factor for Inmate Palacios

17         would be substance abuse, which he

18         has completely abstained from in

19         the last 20 years.  Further, he

20         has attended AA seriously in the

21         last ten years."

22 As indicated it would be longer than ten years.

23         "For all intents and purpose one

24         may conclude Inmate Palacios has

25         abandoned the pursuit or even the

26         desire for illegal drugs or

27         alcohol.  It is very unlikely he

40

1           would be come involved in
2           activities using drugs and
3           alcohol."
4    Clinical observations, comments and
5    recommendations:
6           "Inmate Palacios is competent and
7           responsible for his behavior.  He
8           has the capacity to abide by
9           institutional standards and has
10          generally done so during his
11          incarceration.  Inmate Palacios
12          does not have a mental disorder
13          which would necessitate treatment
14          either during his incarceration or
15          following parole.  It appears very
16          unlikely Inmate Palacios would
17          ever become involved in using
18          illegal drugs or alcohol.
19          However, only for the sake of
20          parole, exercising his
21          responsibility, some abstinence
22          monitoring could be conducted.
23          Inmate Palacios has done very well
24          by being proactive to pursue self-
25          help groups, self-help reading
26          material and in acquiring skills
27          and licenses to be a productive

41

1        and meaningful member of society.

2        Since he has made such good use of

3        the support of AA it would benefit

4        him to continue attending AA when

5        paroled.  After 20 years of

6        incarceration this self-motivated,

7        mature, 40 year old man appears to

8        have a high likelihood of

9        success."

10 Is there anything you would like to add to that

11 report or comment on?

12        **INMATE PALACIOS:**  You mentioned that I

13 had sent out my last lesson for Creative

14 Options.  I got the certificate for it.

15        **DEPUTY COMMISSIONER KEENAN:**  There was

16 mention, he mentioned something about continuing

17 with AA and you provided us a list.  These are

18 some programs.

19        **ATTORNEY TARDIFF:**  Right, where meetings

20 are held on the outside.

21        **DEPUTY COMMISSIONER KEENAN:**  For AA?

22        **INMATE PALACIOS:**  Right.

23        **DEPUTY COMMISSIONER KEENAN:**  Okay.  And

24 that's something you do plan to follow-up on

25 when you get out?

26        **INMATE PALACIOS:**  Yes.

27        **DEPUTY COMMISSIONER KEENAN:**  Okay.  I

42

1  have a certificate of completion here showing
2  successfully completed the correspondence course
3  on anger management, Creative Options.  That was
4  June 24 of '05.  Signed by Sister Marcella
5  Slaughter (phonetic), Coordinator.  Okay.  Thank
6  you.  Okay.  I'm not sure if this is something
7  you wanted to talk about or not.  The report
8  talks about remorse, how we feels.  Is that
9  something he wanted to address or does that
10 touch too much on the life crime?

11         **ATTORNEY TARDIFF:**  Sure, he'll talk
12 about --

13         **INMATE PALACIOS:**  Yes I will.

14         **DEPUTY COMMISSIONER KEENAN:**  Go ahead.

15         **INMATE PALACIOS:**  Well I understand, you
16 know.  I understand how I began that life that
17 led me to my actions.  I understand the impact
18 it had.  I mentioned that my father was killed
19 so I know the pain that people have when you
20 lose a loved one.  So I understand the impact I
21 had on Eddie's mother.  And it's something that
22 will always stay with me, you know.

23         **DEPUTY COMMISSIONER KEENAN:**  Okay.

24         **INMATE PALACIOS:**  I have proven --

25         **DEPUTY COMMISSIONER KEENAN:**  I think you
26 mentioned earlier that you understand the impact
27 but how do you feel about what you did?

43

1      **INMATE PALACIOS:**  It's like -- It's hard
2   to describe it.  It's something that I regret.
3   That I know that I hurt a lot of people.  See
4   it's just like -- I understand that I hurt a lot
5   of people.  Eddie wasn't only my victim.  His
6   mother, his father were hurt because of my
7   actions.  My family.  My community.  Because I
8   realize now that that's the community that my
9   brothers and sisters are raising my nephews and
10  nieces in.  But, you know, I didn't understand
11  that.  And I know that my actions impact more
12  than one person.
13      **DEPUTY COMMISSIONER KEENAN:**  Okay, all
14  right.  And I also wanted to note, just sort of
15  scanning back through some of the past
16  psychological evaluations.  The prior evaluation
17  by Steven Terrini, T-E-R-R-I-N-I, staff
18  psychologist, he notes if you're released to the
19  community dangerousness is considered to be no
20  more than the average relative to the average
21  citizen.  That was on 9/16/98.  Going back to
22  another report by Dr. Terrini of 10/8/97.  He
23  notes violence potential is estimated to be
24  below average relative to this inmate
25  population.  He notes antisocial personality
26  disorder improving.  Polysubstance abuse in
27  institutional remission.  In '95 the same

44

1    diagnosis by a different doctor, Bruce Bakeman,
2    B-A-K-E-M-A-N, clinical psychologist.  He notes
3    you do not have a psychiatric condition which
4    would benefit from mental health treatment
5    following release.  He says you have shown great
6    improvement.  If released you should be able to
7    maintain these gains provided he continues to
8    avoid alcohol and illicit drugs.  And going back
9    to '93.  Who was it?  Dr. Pesevento, P-E-S-E-V-
10   E-N-T-O, clinical psychologist.  He basically
11   just indicates there is no change from the prior
12   evaluations.  We have one from S. Falkenstein,
13   F-A-L-K-E-N-S-T-E-I-N, staff psychiatrist.  That
14   was 1/8/80.  I'm sorry, 1/8/92.  His violence
15   potential outside a controlled setting in the
16   past is considered to have been average and at
17   present is estimated to be decreased.  And the
18   very first report we had was by W. Sigurdson,
19   S-I-G-U-R-D-S-O-N, chief psychiatrist.  Axis I
20   there was no acute psychiatric disorder.
21   Antisocial personality disorder Axis II based on
22   history.  And he notes no need of psychiatric
23   intervention or treatment.  "This young man
24   committed the offense largely because of his
25   involvement with mind-altering substances" it
26   says.  All right.  And with that I'll turn it
27   back to the Chairperson.

45

1          **PRESIDING COMMISSIONER SAWYER:**  Thank
2  you, Commissioner.  I just want to note that the
3  packet of names and addresses for Los Angeles
4  County deals with everything from the
5  Contractor's Board to Alcoholics Anonymous to
6  DMV, EDD.  Kind of every resource, I guess.
7  Where did you get this?
8          **INMATE PALACIOS:**  The IEP class we
9  attend.
10         **PRESIDING COMMISSIONER SAWYER:**  IEP means
11  what?
12         **ATTORNEY TARDIFF:**  Inmate Employability.
13         **PRESIDING COMMISSIONER SAWYER:**  Have you
14  contacted any of these people for a potential
15  job?
16         **INMATE PALACIOS:**  Yes I have several
17  letters that I sent out, résumés, and they sent
18  me response letters.
19         **PRESIDING COMMISSIONER SAWYER:**  Any
20  commitments?
21         **INMATE PALACIOS:**  Well they have some
22  that they're willing to help me out with any
23  training, help me find training, job placement.
24         **PRESIDING COMMISSIONER SAWYER:**  Okay,
25  when I say commitments, did anybody say we're
26  real interested in you becoming a furniture
27  maker, optician, big press?

46

1        **INMATE PALACIOS:**  Well I planned to --

2    No, not exactly.  But they do give me hope that

3    they could assist me to find that type of

4    commitment.

5        **PRESIDING COMMISSIONER SAWYER:**  Okay.

6    This South Bay One Stop Business and Career

7    Center responded to you.  Work Source, you got a

8    letter of business and careers.  So these people

9    say, when you get out come and see us?

10        **INMATE PALACIOS:**  Right.

11        **PRESIDING COMMISSIONER SAWYER:**  Is that

12    what it boils down to?

13        **INMATE PALACIOS:**  Yes, yes.

14        **PRESIDING COMMISSIONER SAWYER:**  Work

15    Source, Community Centers Incorporated, Redondo

16    Beach Parks and Recreation.  They will do an

17    assessment program.  Redondo Beach will do an

18    assessment program and refer you for job search

19    and vocational training.  Did you ever write a

20    letter to Lenscrafters?

21        **INMATE PALACIOS:**  No, not to

22    Lenscrafters.

23        **PRESIDING COMMISSIONER SAWYER:**  Or any of

24    the other large --

25        **INMATE PALACIOS:**  No.  I hope to use

26    that, those avenues right there to get better

27    prepared.  You know, take a fresher-up course,

47

1  upgrade.  Then I plan to go see Lenscrafters, go

2  to newspapers.  Try to get a job at the

3  newspaper printer, as a printer.

4        **PRESIDING COMMISSIONER SAWYER:**  You know

5  what's happening with the newspaper industry,

6  don't you?

7        **INMATE PALACIOS:**  Well I'm sure it's

8  being upgraded.  So that's why I want to be able

9  to --

10        **PRESIDING COMMISSIONER SAWYER:**  It's

11  almost upgraded to the point where they don't

12  need printers anymore.

13        **INMATE PALACIOS:**  Is that right?  I don't

14  know.  I don't know.

15        **PRESIDING COMMISSIONER SAWYER:**  There's

16  less and less jobs in the newspaper business and

17  the newspaper business is going downhill because

18  of the Internet.  I just read something recently

19  on newspaper subscription rates are dropping.

20  Information is so quick through the Internet

21  that why wait until tomorrow.

22        **INMATE PALACIOS:**  Well, I'm pretty sure

23  somebody needs some type of flier or something.

24        **ATTORNEY TARDIFF:**  Kinko's.

25        **PRESIDING COMMISSIONER SAWYER:**  That

26  would be an excellent place to try.

27        **ATTORNEY TARDIFF:**  Yeah.

48

1          **PRESIDING COMMISSIONER SAWYER:**  With

2     printing experience.  Do you have any graphic

3     arts?

4          **INMATE PALACIOS:**  Yeah, I have some

5     graphic arts.

6          **PRESIDING COMMISSIONER SAWYER:**

7     Commissioner, did you find, did you run across

8     any of his chronos on graphic arts?  I didn't

9     hear you mention it because I would have written

10    it down.  I don't mean to put you on the spot.

11    I've got a couple of other questions.

12         **DEPUTY COMMISSIONER KEENAN:**  I believe I

13    did.  Let me --

14         **PRESIDING COMMISSIONER SAWYER:**  If you

15    can check while I ask him a few more questions.

16    I'm trying to bring all this back together again

17    here.  We've been kind of inundated with a lot

18    of information in a short period of time as you

19    can understand.  We have the solid, background

20    core information here and then --

21         **DEPUTY COMMISSIONER KEENAN:**  Graphic arts

22    offset -- It's titled Graphic Arts/Offset

23    Printing completed.

24         **PRESIDING COMMISSIONER SAWYER:**  In what

25    year?

26         **DEPUTY COMMISSIONER KEENAN:**  6/30/00.

27         **PRESIDING COMMISSIONER SAWYER:**  Thank

49

1   you.

2           **DEPUTY COMMISSIONER KEENAN:**  You're

3   welcome.

4           **PRESIDING COMMISSIONER SAWYER:**  You're

5   good, Commissioner.

6           **DEPUTY COMMISSIONER KEENAN:**  Thank you

7   very much.

8           **PRESIDING COMMISSIONER SAWYER:**  I've got

9   a couple of other questions on the information

10  I've been just sort of, kind of (inaudible) here

11  as we've been given new documents.  Tell me

12  about your son, Edward.

13          **INMATE PALACIOS:**  My relationship with

14  him isn't too strong.  I lost him, he was one-

15  and-a-half years old.  His mother decided to

16  take him, you know, and start her life again.

17  So she went on on herself.  I recently came to

18  find out where he lived by coincidence.  My

19  niece, who happened to go to the same school

20  that he did, got a yearbook, seen the name.  She

21  asked my, talked to my sister and she recognized

22  his face right away.  This was about three years

23  ago.  So my niece pursues it; goes back to

24  school to look for him and finds him.  He comes

25  over to my sister's house.  And I've been trying

26  to build a relationship with him since.

27          **PRESIDING COMMISSIONER SAWYER:**  Have you

50

1  spoken to him or written to him?

2      **INMATE PALACIOS:**  I write to him like

3  once a month.  Speaking to him is a little bit

4  more difficult, he's 17 now.  So, you know, I

5  ask him to show up, you know, sometimes he will

6  and sometimes he don't.

7      **PRESIDING COMMISSIONER SAWYER:**  Show up

8  to visit?

9      **INMATE PALACIOS:**  No, to my sister's.  Go

10  to my sister's house so I can talk to him over

11  the phone.

12      **PRESIDING COMMISSIONER SAWYER:**  Does he

13  write to you?

14      **INMATE PALACIOS:**  That boy won't write

15  nobody.  He doesn't write.  He just prefers when

16  I call and he's around I'll talk to him then.

17      **PRESIDING COMMISSIONER SAWYER:**  So what's

18  the information on him?  Is he doing well?

19      **INMATE PALACIOS:**  Yeah, he's doing well.

20  Thank God he's doing well.

21      **PRESIDING COMMISSIONER SAWYER:**  He's not

22  gangbanging?

23      **INMATE PALACIOS:**  No, no he's not.

24      **PRESIDING COMMISSIONER SAWYER:**  Is he

25  still in the same neighborhood vicinity in the

26  Paramount area?

27      **INMATE PALACIOS:**  Yes, yes.

51

1          **PRESIDING COMMISSIONER SAWYER:**  Is that
2    where this crime occurred?
3          **INMATE PALACIOS:**  No.
4          **PRESIDING COMMISSIONER SAWYER:**  That was
5    in what, Lennox?
6          **INMATE PALACIOS:**  Yes, it's farther down
7    south.
8          **PRESIDING COMMISSIONER SAWYER:**  Tell me
9    about Paramount, tell me about the community if
10   you were paroled to Paramount.  There's a lot of
11   gangbanging going on there that you know of?
12         **INMATE PALACIOS:**  It's 20 years.  I'm
13   sure it's changed.
14         **PRESIDING COMMISSIONER SAWYER:**  For the
15   good or the bad?
16         **INMATE PALACIOS:**  Yeah, I'm sure it's
17   better.  I know my sister, she lives right next
18   to a park so, you know.  The school, she tells
19   me the school is near, the park is near, there's
20   a gym.  She says it's calm.  It does have its
21   times when it's loud, you know, sirens.  But she
22   said it's pretty much pretty good.
23         **PRESIDING COMMISSIONER SAWYER:**  Fights?
24         **INMATE PALACIOS:**  Fights?
25         **PRESIDING COMMISSIONER SAWYER:**  Fights in
26   the park?  Gang fights?
27         **INMATE PALACIOS:**  She never mentioned

52

1   that.

2        **PRESIDING COMMISSIONER SAWYER:**   Drugs in

3   the park?

4        **INMATE PALACIOS:**   I'm not sure.   The

5   residence I was hoping to, where I want to

6   parole to is the one in Southgate because I

7   remember that was a pretty nice community.

8        **PRESIDING COMMISSIONER SAWYER:**   Tell me

9   about when you were active in athletics.

10       **INMATE PALACIOS:**   That again it takes me

11  to my brother.   As I seen him -- I can tell you

12  an instance when I decided to always follow my

13  brother.   Well, I think I must have been like

14  eight or nine and I was living in Watts.   And

15  this man brings my -- Well my dad and my mom was

16  looking for my brother, where is he, where is

17  he, and he hadn't came from school and this man

18  comes.   It was a black man so he made an

19  impression right away.   And he tells my father

20  about my brother being athletic and that he took

21  him from school and took him to play ball.   So

22  from then I guess I just started following the

23  steps.   So now I get into all the sports I can,

24  you know.   He did, I did.   And today my knee is

25  bad because I recently blew out my knee.   So I

26  participate in baseball and softball,

27  basketball, soccer.   Just something to keep me

53

1  busy.  Something to keep me occupied and away

2  from just hanging out.

3       PRESIDING COMMISSIONER SAWYER:  However,

4  there was a problem wasn't there?

5       INMATE PALACIOS:  Yes.

6       PRESIDING COMMISSIONER SAWYER:  What was

7  that problem?

8       INMATE PALACIOS:  Drugs.  I had a -- When

9  I was a kid I was beginning drugs.  I was still

10  playing sports.  But my coach used to give us

11  drugs to get us high after a win.  If we didn't

12  win we didn't get anything.

13       PRESIDING COMMISSIONER SAWYER:  What was

14  he giving you?

15       INMATE PALACIOS:  Marijuana.  Basically

16  marijuana, drinking.

17       PRESIDING COMMISSIONER SAWYER:  How old

18  were you?

19       INMATE PALACIOS:  About 14.  Thirteen,

20  14, 15.  That's when I played -- That's when I

21  played hardball.  So yeah, that was a problem.

22  I began to use drugs and they overtook me.

23       PRESIDING COMMISSIONER SAWYER:  Certainly

24  (inaudible).

25       INMATE PALACIOS:  Yes, absolutely.

26       PRESIDING COMMISSIONER SAWYER:  Tell me

27  about step eight in the 12 step program.  What

54

1  is step eight?

2      **INMATE PALACIOS:**  Make a list of all the

3  people I harmed and be willing to make amends.

4  It's a long list.

5      **PRESIDING COMMISSIONER SAWYER:**  Have you

6  done it?

7      **INMATE PALACIOS:**  I've done it to my

8  family, you know.  I asked them forgiveness for

9  not being there.  One day I hope to be able to

10  go my parents' grave, you know.  I lost my

11  parents while incarcerated.  I wasn't there for

12  them, I wasn't there to hold their hands.

13  That's pretty tough.  But I make an effort.  If

14  I wrong someone, if I feel that I wrong someone

15  I will ask for forgiveness, tell them I'm sorry,

16  it was my fault.  I do make an effort.

17      **PRESIDING COMMISSIONER SAWYER:**  Okay.

18  Counsel, you have an opportunity at this point

19  to ask questions of Inmate Palacios.

20      **ATTORNEY TARDIFF:**  Okay.  In terms of --

21  You have three offers of residence; is that

22  correct?

23      **INMATE PALACIOS:**  Right.

24      **ATTORNEY TARDIFF:**  And one is in

25  Southgate and the other two are in --

26      **INMATE PALACIOS:**  Paramount.

27      **ATTORNEY TARDIFF:**  Paramount, okay.  So

55

1   if one residence proved to be too close to gangs
2   you could always go live in another residence,
3   correct?
4        **INMATE PALACIOS:**  But I want to go to
5   Southgate, the residence in Southgate.  My
6   sister Renee, she lives in a better community.
7   It's no gangs pretty much.  So that's where my
8   first choice for residence would be.
9        **ATTORNEY TARDIFF:**  Okay.  And you know
10  this because your sister has told you?
11       **INMATE PALACIOS:**  Right.
12       **ATTORNEY TARDIFF:**  Thanks.  I don't have
13  anything further.
14       **PRESIDING COMMISSIONER SAWYER:**  Okay, I
15  do have a letter from July 9, 2005 from Reyna
16  Palacios and she does have a Southgate, she
17  gives her Southgate address.  You want to go
18  ahead and close, counsel.
19       **ATTORNEY TARDIFF:**  Thanks.  In terms of
20  the commitment offense itself I believe that
21  there are a couple of mitigating factors.  I
22  know that he does have a juvenile record and it
23  was obvious that it was increasing.  But at the
24  same time up until the point of the commitment
25  offense it was not a significant criminal record
26  in terms of violence.  Also I would submit that
27  the situation at the time of the commitment

56

1   offense and what led up to it, that he had

2   particularly the influences of his older

3   brother, which he spoke about today.  I think

4   that does to some extent mitigate what was going

5   on and mitigate the factors of the crime.  Since

6   he's been incarcerated his psych evals almost

7   all indicate that he has significant insight and

8   genuine and sincere remorse for the commitment

9   offense.  I know he didn't discuss the

10  commitment offense here and sometimes it's

11  difficult for the panel to make a decision of

12  suitability when an inmate doesn't discuss the

13  crime.  But the fact of the matter is that he

14  has continuously since he's been incarcerated

15  admitted the commitment offense and his version

16  has always been the same as the official

17  version.  What I find happens is that inmates,

18  after a time of discussing it with the panels,

19  at some point they want to move beyond that and

20  not discuss it any longer.  That's their choice

21  and I don't think it should be used against him

22  that he didn't discuss it.  I think the

23  important thing is that his version has never

24  veered from the official version and his reports

25  indicate that.  So there really isn't an issue

26  in terms of discussing the commitment offense as

27  far as the facts and his version because it

57

1    doesn't differ at all from the official version.

2    Since he's been incarcerated I think it's

3    obvious he's done a good job.  Everything pretty

4    much has been read into the record.  I'm not

5    going to go over all of it again.  The important

6    highlighted points I believe are he has sought

7    out self-help on his own.  It hasn't been

8    structured self-help that's been handed to him

9    in here, so to speak.  The Crim-Anon and the

10   Creative Options and the bible study programs

11   are all correspondence courses which he had to

12   seek out himself through his own efforts and it

13   wasn't something that he, a structured-type

14   self-help within the CDC system.  And I think

15   that that's important because it shows

16   motivation on his part from himself and not from

17   other sources.  Also this book report that he

18   did.  There's very few inmates that you'll find

19   will do that but it is offered as an alternative

20   to self-help and he did it and I think that

21   that's commendable.  And lastly another

22   highlight is the continuous and ongoing

23   involvement in AA.  Continuously for ten years

24   and then he started before that.  At least since

25   1990 and probably sooner.  But the important

26   thing is he's been ongoing for ten years.  So

27   unlike inmates that we see that come in here and

58

1    say that they can't get into AA or this or that
2    we have Mr. Palacios here who has been
3    continuously participating in it.  Again I think
4    an example of his strong motivation to remain
5    clean and sober.  He has his vocations.  Another
6    issue I think for the panel would be he doesn't
7    have a firm job offer.  The regulations require
8    that he have a job offer or marketable skills.
9    We know he has marketable skills.  Graphic arts,
10   it said he was skilled and employable and as the
11   optician.  And again he taught himself through
12   book learning.  Getting the books himself, not
13   being in the structured educational program, to
14   pass the optician's test.  And again that's all
15   entirely self-motivating.  He does have the one
16   sister who can help him with employment; she
17   works for the county.  He has also made contacts
18   with agencies so when he gets out he knows where
19   to go for job employment.  Maybe to take away
20   from the negativity of not having a firm offer
21   is the fact that I think he has very strong
22   family support, especially from his sisters.
23   They're going to be there for him.  I doubt if
24   they're going to let him get with not working
25   and I don't think he doesn't want to work.  We
26   know it's going to be tough when he gets out in
27   terms of, you know, finding somebody that's

59

1  going to be willing to give him a job.  But I

2  think with the help of his sisters and with his

3  own motivation, which he's shown in here, the

4  stuff he's done on his own, I don't think that

5  that should be a problem.  He's educationally

6  upgraded himself and continues to do so with the

7  video series and the FEMA courses.  He's only

8  had one 115 in 1990 and that was administrative

9  in nature.  He stole food and he had to pay

10  $3.50 back for that.  He has no evidence of

11  further gang activity and obviously he has had

12  no violence of any sort since he's been

13  incarcerated.  His psych evals since 1988 are

14  supportive of release.  Most of that has been

15  entered into the record and I'm not going to go

16  over it again.  Just about everything was gone

17  over.  In the most current '05 evaluation it

18  does state under the life crime that

19  Mr. Palacios had two very destructive role

20  models in his brother, who did well in athletics

21  but became a gang member, and in his coach, who

22  encouraged athletic performance while leading

23  the children into drug and alcohol abuse.  And

24  again his remorse, genuinely remorseful.  He

25  truly understands the scope of his actions and

26  the tragic consequences.  His grief and remorse

27  is honest and sincere.  And then the assessment

60

1   of dangerousness, which is below average or
2   average relative to the average citizen is based
3   on absolutely no violent criminal history except
4   for the commitment offense.  Has only had one
5   very minor rule infraction and has exhibited
6   tremendous maturity and proactive involvement in
7   programming.  The risk factors that have been
8   present are obvious substance abuse.  And I
9   think that anybody who has had an issue with
10  drug or alcohol abuse, that's always going to be
11  a risk factor until you're in the grave, so to
12  speak.  But it can be reduced significantly and
13  he's done that through his involvement in AA.
14  And as the most recent psych eval says, one may
15  conclude that Inmate Palacios has abandoned the
16  pursuit of even the desire for illegal drugs and
17  alcohol and it is very unlikely he would become
18  involved in activities using drugs and alcohol.
19  It says, after 20 years of incarceration this
20  self-motivated, mature, 40 year old man appears
21  to have a high likelihood of success.  And to
22  back up the risk factor of abuse, he has not
23  used for 20 years.  I know that's self-reporting
24  but he hasn't had a 115 involving any drugs or
25  alcohol.  And I doubt after 20 years that he
26  would want to give up that long-term sobriety to
27  have to start all over again.  And I think that

61

1   being involved in AA and having to stand up

2   again as a newcomer after 20 years is pretty,

3   that's pretty hard to do and I think that is a

4   deterrent in and of itself.  And I know that a

5   lot of the prior psych evals have been read into

6   the record and I appreciate that because I was

7   going to do that.  But in any event, in '98 it

8   says his prognosis for community living is quite

9   positive based on his family support and his

10  employment as an optician.  Under the life crime

11  it said, we discussed membership in gangs and he

12  seemed to understand the many adverse effects of

13  participating in gangs.  I believe he is quite

14  sincere in discussing these issues and believe,

15  as Dr. Bakeman's past evaluations indicated,

16  that this inmate's insight and judgment have

17  greatly improved.  The remorse he expressed for

18  his crime appeared to be genuine and

19  appropriate.  Again in the '97 psych eval he

20  demonstrated good insight into his commitment

21  offense and his judgment also appeared good.  In

22  '95 his insight and judgment appeared greatly

23  improved.  If released -- This is the '95.  If

24  released he should be able to maintain his

25  gains.  He has made some important decisions and

26  changes in his thinking pattern now and has

27  gained a valuable skill as an optician.  And

62

1   then the '88 evaluation: "This young man

2   committed the offense largely because of his

3   involvement with mind-altering substance.  His

4   personality pattern is well organized.  There is

5   no disorganization or disruption of his general

6   thinking behavior systems."  His Board Reports

7   or counselor's reports, while they don't make

8   assessments of dangerousness any longer, they

9   did used to do that.  And starting in '01 he got

10  low, '02 he got low and '03.  And those are from

11  counselors that at least early on in

12  incarceration and up until the last three or

13  four years knew the inmates quite well.  The

14  3042 notice, the sheriff's response.  I would

15  like to add that their response that he not be

16  found suitable, they base it strictly on the

17  commitment offense alone.  They don't bother to

18  assess what Mr. Palacios has done since he's

19  been incarcerated.  He has good use of his free

20  time, that's obvious, and I would submit that he

21  has served enough time for the crime.  It's

22  close to 20 years now, just shy by what, 52 days

23  or something like that did you say?

24          INMATE PALACIOS:  Now it's 14.

25          ATTORNEY TARDIFF:  Fourteen days.  He's

26  served enough time for this crime.  I think he

27  has made himself suitable.  Further

63

1   incarceration at this point would be punishment

2   alone and I believe that he is suitable for

3   release.   Thank you.

4       **PRESIDING COMMISSIONER SAWYER:**   The crime

5   occurred -- Just to clarify the length of time.

6   The crime occurred September 2 and he was

7   arrested after that.   You're right, it's about

8   30 days short of 20 years.

9       **ATTORNEY TARDIFF:**   Okay, thanks.

10      **PRESIDING COMMISSIONER SAWYER:**

11  Mr. Palacios, this is your opportunity to tell

12  us why we should give you a date.

13      **INMATE PALACIOS:**   First of all, I am

14  sorry for what I did.   I understand what I did,

15  I understand the scope of what I did, the impact

16  it had on a lot of people and I am sorry for

17  taking Eddie's life.   I realize that there were

18  factors in my life that contributed directly to

19  my actions and I have dealt with them.   I

20  realized early that I had to get my life in

21  order.   And I have spent 20, almost 20 years in

22  prison.   And I have stayed away from the

23  negativity, I have no gang involvement, no

24  drugs, no violence.   I made a conscious effort

25  to get my life in order.   In that time I have

26  educated myself, I have job skills that I can

27  use to help me back in society.   A positive

64

1   psych report.  I have always gotten positive

2   psych reports because I've always made an effort

3   to get my life in order.  If having not spoken

4   about my committed offense is going to create

5   some (indiscernible) I'll go back out there and

6   we can start again.  I'm willing to speak about

7   it.  Today I chose not to and I don't want that

8   to be a sticking point in your decision.  I'm

9   willing to speak to it, about it.  I've done all

10  -- I could do more and I will do more.  Once I'm

11  on the streets and back in society with my

12  family I will continue.  I'm not going to look

13  back.  I'm headed on the right path now.  I

14  understand that drugs, gangs led me here and I

15  dealt with it.  Right now I have my family

16  support that's going to help me make the

17  transition.  Today I ask this panel to judge me

18  for who I am today, not the kid that was

19  influenced 20 years ago.  That's all I'd like to

20  say, thank you.

21          **PRESIDING COMMISSIONER SAWYER:**  Thank

22  you.  We will now recess for deliberations.  The

23  time is 10:31.

24                  **R E C E S S**

25                  --oOo--

26

27

65

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER KEENAN:  We are back

4     on record.

5          PRESIDING COMMISSIONER SAWYER:  Back on

6     record.  It's 12 o'clock noon.  I would like to

7     also indicate that Deputy District Attorney

8     Archuleta has arrived and is in the room.

9          DEPUTY DISTRICT ATTORNEY ARCHULETA:  Do

10    you want me to spell my name, Commissioner?

11         PRESIDING COMMISSIONER SAWYER:  No.

12         DEPUTY DISTRICT ATTORNEY ARCHULETA:

13    Okay.

14         PRESIDING COMMISSIONER SAWYER:  That's

15    fine.  Yes, go ahead and spell your name.

16         DEPUTY DISTRICT ATTORNEY ARCHULETA:  D-E-

17    B-R-A, A-R-C-H-U-L-E-T-A, Deputy District

18    Attorney for the County of Los Angeles.

19         PRESIDING COMMISSIONER SAWYER:  And she

20    will be observing.

21         DEPUTY DISTRICT ATTORNEY ARCHULETA:

22    Thank you.

23         PRESIDING COMMISSIONER SAWYER:  Okay, in

24    the matter of inmate Edward --

25         INMATE PALACIOS:  Palacios.

26         PRESIDING COMMISSIONER SAWYER:  Palacios,

27    EDWARD PALACIOS D-27035 DECISION PAGE 1 08/03/05

66

1    sorry.  The panel has reviewed all of the

2    information received from the public and relied

3    on the information and following circumstances

4    in concluding that the prisoner is suitable for

5    parole and would not pose an unreasonable risk

6    of danger to society or a threat to public

7    safety if released from prison.  The prisoner

8    has no juvenile record of assaulting others.

9    Although he has a juvenile record of substance

10   abuse, carrying a weapon and being involved in

11   some other crimes there are no violent crimes.

12   While in prison the prisoner has enhanced his

13   ability to function within the law upon release

14   through participation in AA approximately 15

15   years, a GED in 1989, he's a certified optician,

16   completed graphic arts/offset printing program,

17   has work experience in the furniture assembly

18   area, has educational programs and Impact,

19   Breaking Barriers, Alternatives to Violence,

20   Anger Management, has institutional job

21   assignments and skills in culinary, has made

22   book reports through Dr. Gleason's Book Report

23   Club, is certified for FEMA disasters and has a

24   bible correspondence school.  He has done very

25   well.

26        INMATE PALACIOS:  Thank you.

27   EDWARD PALACIOS D-27035 DECISION PAGE 2 08/03/05

67

1          **PRESIDING COMMISSIONER SAWYER:**  Done very

2     well in the area of his work experience, his

3     programming.  He's even gone to schools that

4     weren't part of the program.  He's gone a step

5     above and we feel that's commendable.  I'm also

6     going to back up just a little bit on the

7     certified optician.  In a previous -- During

8     deliberations and during the interview we

9     discussed it and he is a certified optician.

10    (Indiscernible) as an optician.  As we

11    mentioned, Lenscrafters.

12          **INMATE PALACIOS:**  Right.

13          **PRESIDING COMMISSIONER SAWYER:**  Building

14    eyeglasses for people.  And he's certified to do

15    that, which is, of course, an excellent option

16    in the community.  As well as the graphic arts

17    and offset printing and heavy printing presses.

18    He was trained and completed a course in that

19    and we have documentation to back that up.  He

20    lacks a significant criminal history of violent

21    crime.  The only violent crime you committed,

22    sir, was the violent crime you're here for.  You

23    had no adult violent crime.  You had no adult

24    record, although there's only two years between

25    your juvenile record and this violent crime.

26    You had no adult crime and this was it, this was

27    **EDWARD PALACIOS D-27035 DECISION PAGE 3 08/03/05**

68

1     the big one.  Because of maturation, growth,
2     greater understanding and advanced age he has
3     reduced his probability of recidivism.  Twenty
4     years in custody, no violence.  Programs, self-
5     help, you completed programs.  All of this --
6     And particularly one of the programs, the most
7     important program he's going to take with him
8     and do his homework on for the rest of his life
9     is AA.  He indicated that earlier.  He has
10    realistic parole plans, family support and
11    market skills.  He has a bag full of market
12    skills, if I could use that term.  If you don't
13    take advantage of that you're a fool.
14          INMATE PALACIOS:  I will.
15          PRESIDING COMMISSIONER SAWYER:  And
16    you'll get yourself in some serious trouble.
17    You've got a loving family, they have offered
18    residence, residential care, and in the time
19    between now and whenever it is you are
20    subsequently released you need to start filling
21    out job applications and get some options going.
22          INMATE PALACIOS:  I will.
23          PRESIDING COMMISSIONER SAWYER:  He
24    maintained close family ties while in prison via
25    letters and/or visits.  He has three very close
26    sisters.  He has some brothers.  One brother who
27    EDWARD PALACIOS D-27035 DECISION PAGE 4 08/03/05

69

1    we do not want him to associate with, that got

2    him going in the gang problems to begin with,

3    and he has indicated the rest of his brothers

4    and his sisters -- In particular we have letters

5    from your sisters.  We have no letters from your

6    brothers but three sisters that are there to

7    support you and two out of the three live in LA

8    County.

9         INMATE PALACIOS:  Los Angeles, yes.

10        PRESIDING COMMISSIONER SAWYER:  And they

11   have offered a place to stay and a positive

12   environment.  He has maintained positive

13   institutional behavior as a result of his

14   significant self-improvement programs and self-

15   control.  I must mention that he had, for the

16   record, one 115 in 20 years and that was for

17   stealing food.  That was an administrative 115

18   and you were fined $3.50 for (indiscernible)

19   twice.

20        INMATE PALACIOS:  Right.

21        PRESIDING COMMISSIONER SAWYER:  Stealing

22   state food.  He's had -- Any 128s?

23        DEPUTY COMMISSIONER KEENAN:  No 128s.

24        PRESIDING COMMISSIONER SAWYER:  No 128s,

25   No 128(a)s.

26        DEPUTY COMMISSIONER KEENAN:  No 128(a)s.

27   EDWARD PALACIOS D-27035 DECISION PAGE 5 08/03/05

70

1    PRESIDING COMMISSIONER SAWYER:  Sorry.

2    No 128(a)s, which are counseling memos.  Twenty

3    years, I don't know if any of us could do that.

4    INMATE PALACIOS:  Sure you can.

5    PRESIDING COMMISSIONER SAWYER:  You're to

6    be commended for that sir and there is a payday

7    we hope.  He shows signs of remorse.  He has

8    indicated that he understands the nature and

9    magnitude of the offense and accepts

10   responsibility for his criminal behavior and has

11   a desire to change towards good citizenship.  I

12   think even though you stated to the Board you

13   have remorse, it is also indicated in your

14   psychiatric reports consistently.  I would like

15   to think that even though people tell us they're

16   remorseful, I think there was an event in your

17   life that I brought up to you, you got kind of a

18   scary look on your face when I said, your father

19   was killed in a fight or a robbery.

20   INMATE PALACIOS:  A robbery attempt.

21   PRESIDING COMMISSIONER SAWYER:  Two years

22   -- a year later after you stabbed the other

23   victim.  And I think that really had brought

24   that home.  It brought home the fact that

25   somebody did to your father what you did to

26   somebody else and affected the family in the

27   EDWARD PALACIOS D-27035 DECISION PAGE 6 08/03/05

71

1   same way you were affected.

2       **INMATE PALACIOS:**  It played a great part

3   in it.

4       **PRESIDING COMMISSIONER SAWYER:**  Another

5   reason the information bearing upon suitability

6   for release: Again continuing to see the -- I

7   don't put a lot of weight on psychs unless

8   they're consistent.  These psychs have been very

9   consistent.  They have been consistent and

10  positive up until the recent psych they just

11  brought in to us.  Your personal growth and

12  vocational growth while you've been here is all

13  positive.  It's all been in the same direction.

14  There haven't been any skips, there hasn't been

15  any -- You haven't fallen down to have to pick

16  yourself up and start all over again.  You've

17  got 20 years of positive, continuing growth and

18  it's clear we don't want to see that stop.

19      **INMATE PALACIOS:**  No.

20      **PRESIDING COMMISSIONER SAWYER:**  Base term

21  of confinement: The base life offense for which

22  the prisoner has been convicted, second degree

23  PC 187.  The events occurred September 2nd,

24  1985.  The panel finds the category C-3 on the

25  matrix, death resulted from severe trauma

26  inflicted with deadly intensity, stabbing.

27  EDWARD PALACIOS D-27035 DECISION PAGE 7 08/03/05

72

1  Multiple wounds inflicted with a weapon, none

2  resulting in immediate death.

3      **DEPUTY COMMISSIONER KEENAN:**  Excuse me,

4  we're about to run out of tape.

5      (Tape One was changed to Tape Two.)

6      **DEPUTY COMMISSIONER KEENAN:**  Back on

7  record, tape two side one.

8      **PRESIDING COMMISSIONER SAWYER:**  I was

9  reading C-3.  And that's C, number three down.

10  No prior relationship with the victim; the

11  victim had little or no personal relationship

12  with the prisoner.  The panel assesses 240

13  months for the base offenses and notes that this

14  is the middle term.  The total term calculation:

15  Base life term, 240 months.  Post-conviction

16  credits August 3rd, '86 to August 3rd, 2005 is

17  72 months.  The total period of confinement,

18  that's 72 minus 240 is 168 months is your total

19  confinement.  Special conditions of parole.

20  Mr. Palacios, I want you to pay particular

21  attention to this because this is going to

22  follow you the rest of your life.

23      **INMATE PALACIOS:**  Yes.

24      **PRESIDING COMMISSIONER SAWYER:**  If in

25  fact you are paroled.  The following conditions

26  of parole are as imposed: Do not use alcoholic

27  EDWARD PALACIOS D-27035 DECISION PAGE 8 08/03/05

73

1  beverages, submit to alcohol testing, submit to
2  anti-narcotic testing, submit to THC testing,
3  participate in substance abuse programs such as
4  AA.  You will not actively participate in,
5  promote, further or assist in any prison gang,
6  disruptive group or criminal street gang
7  activity as enumerated in Penal Code Section
8  186.22 subdivision E1-23 nor violate any gang
9  abatement injunction, ordinance or court order.
10 You will not associate with any prison gang,
11 disruptive group or street gang member known to
12 be such by you or carry or wear on your person
13 any gang colors, any sign, any symbol or
14 paraphernalia known to be associated with any
15 gang activity.  Do you understand that?
16        INMATE PALACIOS:  Yes.
17        PRESIDING COMMISSIONER SAWYER:
18 Mr. Keenan.
19        DEPUTY COMMISSIONER KEENAN:  Yes, just a
20 couple of comments.  First I would like to note
21 that I wholeheartedly endorse all the comments
22 just made by Commissioner Sawyer.  And in
23 addition I just want to take notice of something
24 from the most current psychiatric evaluation.
25 The last line is, after 20 years of
26 incarceration this self-motivated, mature 40
27 EDWARD PALACIOS D-27035 DECISION PAGE 9 08/03/05

74

1    year old man appears to have a high likelihood
2    of success.  And a little further back in the
3    report the last sentence before the diagnostic
4    impression it says, this truly does not appear
5    to be the same man who was incarcerated 20 years
6    ago.  And just sort of the review of the
7    psychiatric evaluations.  It shows somebody who
8    has been improving and achieving personal growth
9    since the very start.  If you track the
10   psychological evaluations every one of them is
11   talking about how you're doing better, you know.
12   You're improving, there's some personal growth
13   taking place.  And you get to the last two in
14   particular and they're very positive reports.
15   The current one indicates your dangerousness is
16   considered to be average to below average
17   relative to the average citizen.  And the report
18   that we had that preceded that, the full report
19   back in '98 by Steven Terrini, which is what,
20   about seven years ago.  Thereabouts anyway.  Is
21   also noting at that point, if released to the
22   community the dangerousness is considered to be
23   no more than the average relative to the average
24   citizen.  And that's by  a different doctor.
25   Whenever you have a medical condition and you're
26   trying to decide what to do and it's something
27   EDWARD PALACIOS D-27035 DECISION PAGE 10 8/03/05

75

1   of great importance to you, you always seek a

2   second opinion.  Well we have two doctors, in

3   recent times at any rate, telling me the same

4   thing, that you're not dangerous.  And that just

5   seems to mesh with everything I see in your

6   record.  You have made a real effort at personal

7   change and it seems to have started right at the

8   beginning.  You were going to AA back in '90.  I

9   think you thought that you might have done

10  something a little before that but what I saw in

11  the file was '90.  And your programming started

12  early on.  You seem like you were committed to a

13  personal change from the start and it looks like

14  you've done that.  The psychiatrists seem to

15  think so, we think so and it's all very

16  consistent with your actions.  These opinions

17  just mesh with your actions over time, a long

18  stretch of time.  And it's not a short-term

19  change.  When you see something over that

20  stretch of time it seems pretty clear to me it's

21  the real deal.  I just want to congratulate you

22  for your hard work.

23        INMATE PALACIOS:  Thank you.

24        DEPUTY COMMISSIONER KEENAN:  And wish you

25  the best of luck.

26        INMATE PALACIOS:  Thank you.

27  EDWARD PALACIOS D-27035 DECISION PAGE 11 8/03/05

76

1          **PRESIDING COMMISSIONER SAWYER:**  I have

2     one more thing to read and that is the notice to

3     the CDC staff.  Do not release the inmate until

4     the Board of Prison Terms and the Governor's

5     Review.  Also, if this decision is final you

6     will get a parole date.  The Board will send you

7     a copy of the decision.  If this decision is

8     changed you will be told why.  The Board may set

9     up another hearing if the decision is changed or

10    taken away.  Also one final note, this is not a

11    final decision.  Do not break any rules in the

12    California Code of Regulations Title 15 Section

13    2451.  If you break any rules your release date

14    may be changed or taken away.  Do you understand

15    that?

16          **INMATE PALACIOS:**  Yes, I understand.

17          **PRESIDING COMMISSIONER SAWYER:**  Good luck

18    to you.

19          **INMATE PALACIOS:**  Thank you, thank you.

20                        --oOo--

21

22

23    PAROLE GRANTED                    PENDING REVIEW

24    THIS DECISION WILL BE FINAL ON: AND APPROVAL

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    EDWARD PALACIOS D-27035 DECISION PAGE 12 8/03/05

77

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated transcriber,
PETERS SHORTHAND REPORTING, do hereby declare and
certify under penalty of perjury that I have
transcribed tape(s) which total two in number and
cover a total of pages numbered 1 - 76, and which
recording was duly recorded at CORRECTIONAL TRAINING
FACILITY, SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF EDWARD
PALACIOS, CDC NO. D-27035, ON AUGUST 3, 2005, and that
the foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned tape to
the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated August 21, 2005, at Sacramento County,
California.

_____
RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

EXHIBIT 5

*PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS*
*(REVISED AUGUST 1998)*
*PAROLE CONSIDERATION HEARING*
*AUGUST 2005 LIFER CALENDAR*

*CORRECTIONAL TRAINING FACILITY, SOLEDAD*
*JUNE 9, 2005*

This is an addendum psychological evaluation to the sixth report for the Board of Prison Terms on inmate Edward Palacios, CDC# D-27035. The sixth evaluation was conducted on 09/16/98, while this update was completed on 06/10/05. Inmate Palacios is aware of the purpose of the evaluation, and agreed to participate, given the limited confidentiality provisions.

Since this is an updated psychological report for the Board of Prison Terms, only new and pertinent information will be included, as the essential facts related to inmate Palacios are in the 09/16/98 psychological evaluation.

| | | | |
|---|---|---|---|
| *NAME:* | PALACIOS, EDWARD | *CRIME:* | Murder, second degree |
| *CDC #:* | D-27035 | *TERM:* | 15 years to life |
| *DOB:* | 10/14/64 | *OFFENSE DATE:* | 09/02/85 |
| *AGE:* | 40 | *ARREST DATE:* | 09/25/85 |
| *RACE:* | Hispanic | *SENTENCE DATE:* | 03/21/86 |
| *SEX:* | Male | | |
| *MARITAL:* | Divorced | | |
| *RELIGION:* | Catholic | | |
| *EVALUATION DATE*: | 06/10/05 | | |

*EVALUATOR:*      J. Steward, Psy.D.
                 Clinical Psychologist
*INSTITUTION:*    Correctional Training Facility, Soledad, CA

I.    **IDENTIFYING INFORMATION:**

Inmate Edward Palacios, CDC# D-27035, is a 40-year-old, divorced, Hispanic male, raised Catholic, serving 15 years to life for murder, second degree. He does not have any unusual physical characteristics. His past nicknames have been "Payaso", translated "clown" in English.

II.   **EDUCATIONAL HISTORY:**

Inmate Palacios has been very proactive and responsible in pursuing the educational programs and self-improvement opportunities available in prison. He

*PALACIOS, EDWARD*
*CDC NUMBER: D-27035*
*BPT MENTAL HEALTH EVALUATION*
*PAGE TWO*

has completed Anger Management, Dr. Gleason's Book Club (where one reads a self-help book, integrating the concepts and self-application by completing a report), and Creative Options, in which he just sent his last lesson in regarding anger management. He has received certifications for FEMA in emergency and preparedness; in animals and disasters; and in community planning. He also completed a video reporting class sponsored by CTF's educational department. Inmate Palacios also initiated corresponding with and becoming involved in CRIMINON, a program offered by E. L. Ron Hubbard to assist inmates in understanding themselves and living more productive lives. In addition, inmate Palacios initiated contact with a Biblical correspondence school, receiving a certificate in his studies on 02/21/04.

## VI.    MARITAL HISTORY:

Inmate Palacios is the father of a 16-year-old son, Edward, by his only marriage. The prior report indicated that his son was two years old; however, this was an error.

## VIII.    EMPLOYMENT/INCOME HISTORY:

During inmate Palacios' incarceration, he has excelled in becoming a licensed optician through PIA, and plans to find work in that area when paroled. He has also completed three years in offset printing, and currently is studying furniture construction and assembly.

## IX.    SUBSTANCE ABUSE HISTORY:

Inmate Palacios has not used alcohol or illicit drugs since his incarceration, and has regularly attended Alcoholics Anonymous for the last ten years.

## CLINICAL ASSESSMENT

## XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Palacios was cooperative and very attentive throughout the interview. His eye contact was excellent, and he was effectively engaged in conversation with the evaluator. At the same time, he was calm and relaxed, without any signs of anxiety. His speech was clear, and his flow of thoughts were rational, logical, and well organized. His mood and affect are within the normal range. He does not have any signs or symptoms of a mood or a thought disorder. His intellectual functioning is estimated to be in the average range. He has excellent insight into

*PALACIOS, EDWARD*
*CDC NUMBER: D-27035*
*BPT MENTAL HEALTH EVALUATION*
*PAGE THREE*

his committing offense, and genuinely, deeply regrets the death of the victim, who he referred to as "Eddie." His eyes turned red and about to water as he discussed the senseless nature of the crime. Inmate Palacios has very good judgment and very good impulse control. This truly does not appear to be the same man who was incarcerated 20 years ago.

## *CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):*

| | |
|---|---|
| *AXIS I:* | Polysubstance abuse, in institutional remission. |
| *AXIS II:* | None noted at this time. |
| *AXIS III:* | No contributory physical disorder. |
| *AXIS IV:* | Incarceration. |
| *AXIS V:* | GAF = 95. |

## XIII.  *REVIEW OF LIFE CRIME:*

Inmate Palacios' description of the crime is consistent with the facts in the probation officer's report.

In brief, to recap the events 20 years ago, the victim (17-year-old Eddie Angulo), a "Lennox" gang member, and his girlfriend were in Lennox Park. Inmate Edward Palacios was driving a truck with Carlos Soto and Robert Sanden as passengers when they approached Eddie Angulo to ask where he lived. A verbal confrontation ensued, with the truck occupants exiting. Robert Sanden and Carlos Soto each took a baseball bat, striking the victim, and inmate Palacios used a knife to stab the victim six times in the chest and abdomen, which led to Eddie Angulo's death.

Inmate Palacios acknowledged being heavily under the influence of drugs at the time of the offense, and is well aware of the many adverse and destructive aspects of being involved in gangs. In explaining his being drawn into gangs, it was a significant part of the subculture where he wanted to fit in, having a group that he belonged to that gave him a sense of confidence, respect, and self-esteem. Inmate Palacios stated, "When you are young, you want to make your own decisions. If you grab hold of the wrong role model, you go the wrong way."

When inmate Palacios was eight years old, he remembers realizing he had an older brother to whom he could look up to and admire. One day, a man brought his brother home to compliment his parents on his exceptional athletic abilities. Since then, his older brother received a lot of attention and praise for his athletics, but also became involved in the gang lifestyle. When inmate Palacios entered into athletics, each time they won a game, the coach would buy them marijuana and beer to celebrate, a poor and deadly example equating drugs with success.

*PALACIOS, EDWARD*
*CDC NUMBER: D-27035*
*BPT MENTAL HEALTH EVALUATION*
*PAGE FOUR*

Inmate Palacios had two very destructive role models in his brother, who did well in athletics, but became a gang member, and in his coach, who encouraged athletic performance, while leading the children into drug and alcohol abuse.

As inmate Palacios recalls this time in his life, when the offense was committed, he expresses some disbelief that he had a job that paid him well, had recently purchased a new truck, and yet he lost his focus. Regarding the actual death of Eddie, inmate Palacios states, "If I say it today, I can't believe I let myself get into that position. I did not have any guidance. I did not look to the future until something tragic happened. It was not until you do this that you realize."

Inmate Palacios is genuinely remorseful for Eddie's death, and wishes he could change what happened. Some inmates give "lip service" to grief or regret, and others are indifferent. However, inmate Palacios truly understands the scope of his actions, and the tragic consequences. Inmate Palacios' grief and remorse is honest and sincere.

XIV.    *ASSESSMENT OF DANGEROUSNESS:*

A.      During his entire incarceration of 20 years, he has only received one CDC-115 for taking food from the commissary. If one has any familiarity with the prison system and culture, the fact inmate Palacios went back for a second tray of food is at the most a miniscule rule infraction. Given that inmate Palacios has absolutely no violent criminal history except for the committing offense, has only one very minor rule infraction, and has exhibited tremendous maturity and proactive involvement in programming, his potential for violence within a controlled setting is very much significantly below average relative to the inmate population.

B.      If released to the community, inmate Palacios' dangerousness is considered to be average to below average relative to the average citizen.

C.      The primary risk factor for inmate Palacios would be substance abuse, which he has completely abstained from in the last 20 years. Further, he has attended AA seriously in the last ten years. For all intent and purposes, one may conclude inmate Palacios has abandoned the pursuit or even the desire for illegal drugs and alcohol. It is very unlikely he would become involved in activities using drugs and alcohol.

XV.    *CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:*

1)      Inmate Palacios is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and has generally done so during his incarceration.

PALACIOS, EDWARD
CDC NUMBER: D-27035
BPT MENTAL HEALTH EVALUATION
PAGE FIVE

2)      Inmate Palacios does not have a mental disorder which would necessitate
        treatment either during his incarceration or following parole.

3)      It appears very unlikely inmate Palacios would ever become involved in
        using illegal drugs or alcohol. However, only for the sake of parole
        exercising its responsibility, some abstinence monitoring could be
        conducted. Inmate Palacios has done very well by being proactive to
        pursue self-help groups, self-help reading material, and in acquiring skills
        and licenses to be a productive and meaningful member of society. Since
        he has made such good use of the support of AA, it would benefit him to
        continue attending Alcoholics Anonymous when paroled. After 20 years
        of incarceration, this self-motivated, mature, 40-year-old man appears to
        have a high likelihood of success.

J. Steward, Psy.D.
Clinical Psychologist
Correctional Training Facility, Soledad

Bill Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

JS/gmj

D: 06/10/05
T: 06/11/05

D:\Word Files\BPT - 2005\PALACIOS, ED  D-27035  07-05  STEWARD.doc

EXHIBIT 6

**BOARD OF PRISON TERMS**                                    **STATE OF CALIFORNIA**
**LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION**
**GRANT PAROLE**

**NOTE TO CDC STAFF: Do not release the inmate until after BPT and Governor's review.**

**PAROLE GRANTED**

If this decision is final, you WILL get a parole date. The Board will send you a copy of the decision. If this decision is changed, you will be told why. The Board may set up another hearing if the decision is changed or taken away.

A. Base time in prison.................................................... __240__ Months

A 77278 _____ 1 _____ 187 PC 2ND

Case #                    Count #                    Offense

B. Time for using a weapon................................................ + __O__ Months

C. Time for other crimes.................................................. + __O__ Months

__O__

Case #                    Count #                    Offense       Months

__O__

Case #                    Count #                    Offense       Months

__O__

Case #                    Count #                    Offense       Months

D. Total term................................................ = __240__ Months

E. Time credit from __3-31-86__ to __8-3-2005__ - __72__ Months
                     (Life term start date)   (Date of hearing)

F. ................................................ = __168__ Months

**NOTE:** This is not a final decision. Do not break any rules in California Code of Regulations, Title 15, Section 2451. If you break any rules, your release date may be changed or taken away.

**HEARING PANEL**

Name __Thom Sawin__                    Date __AUG__

Name __Wendy Kfu__                     Date __3__

Name _____                      Date __2005__

| NAME | CDC# | PRISON | DATE |
|------|------|--------|------|
| PALACIOS | D-77035 | CTF | AUG 3, 2005 |

BPT 1005(a)(REV. 01/02)

Distribution: White - C. File
Canary- BPT
Pink- Prisoner

EXHIBIT 7

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
## (Penal Code Section 3041.2)

**EDWARD PALACIOS, D-27035**
**SECOND-DEGREE MURDER**

AFFIRM: _____

MODIFY: _____

REVERSE: _____X_____

On September 2, 1985, 21-year-old Edward Palacios, Carlos Soto, and Robert Sanden beat and stabbed to death 17-year-old Eddy Angulo.

At approximately 1:40 that morning, Mr. Angulo, his girlfriend, and other acquaintances were at a park in the Los Angeles area when Mr. Palacios, Mr. Soto, and Mr. Sanden, all three of whom were members of the Little Watts street gang, passed by in a truck. Mr. Palacios was driving. At some point, someone in the truck asked Mr. Angulo where he was from, and when he said Lennox, a verbal confrontation ensued and Mr. Palacios, Mr. Soto, and Mr. Sanden all jumped out of the truck and chased Mr. Angulo down. Mr. Soto and Mr. Sanden beat Mr. Angulo with baseball bats, and Mr. Palacios stabbed him with a knife six times. Afterwards, Mr. Palacios and his crime partners drove away in the truck. Mr. Angulo died a week later from a stab wound to his heart.

When arrested, Mr. Palacios denied being at the park when the murder occurred, but subsequently accepted a plea arrangement, pled guilty to second-degree murder and was sentenced to 15 years to life in prison. He was no stranger to the criminal-justice system at the time. At age 15, he was placed on probation for committing a burglary, and over the course of the next two years, although never prosecuted, was arrested for possession of a dangerous weapon (nunchuk sticks), hit and run with injury, minor in possession of an alcoholic beverage, petty theft, and public intoxication.

Since his incarceration approximately 20 years ago, Mr. Palacios has maintained a virtually blemish-free conduct record and has made efforts to enhance his ability to function within the law upon release. In addition to earning his GED, he has continued his education through video instruction and has earned his optician's license from the American Board of Optics. He has also completed vocational graphic arts and dry cleaning and has held skilled jobs within the institutional setting. He has participated in a joint Alcoholics Anonymous/Narcotics Anonymous program for the last 15 years and has availed himself of other self-help and therapy, including IMPACT, Anger Management, Life Skills, Breaking Barriers, Alternative to Violence, Vital Issues, and Cal OSHA's Hazardous Communications "Right to Know" program. Likewise, he has received favorable evaluations from correctional and mental-health professionals, has family support waiting for him outside of prison, and has marketable skills and a viable, confirmed housing offer upon parole. All of things support Mr. Palacios' parole suitability at this time.

Edward Palacios, D-27035
Second-Degree Murder
Page 2

But the nature and magnitude of the murder Mr. Palacios committed cannot be overlooked. He and his crime partners spotted Mr. Angulo at a park, jumped out of their truck, chased him down, and beat and then stabbed him to death because they believed he was a member of a rival gang. This was a vicious, unprovoked, gang-related murder. And Mr. Palacios' role in it was active, willing, and demonstrative of exceptional depravity, cruelness, and disregard for human life and suffering. Not only was Mr. Angulo outnumbered and attacked with a baseball bat, he was repeatedly stabbed by Mr. Palacios with a knife. According to the probation report, the coroner found six separate stab wounds to Mr. Angulo's chest and abdomen and determined the cause of his death was a stab wound that penetrated the heart and cut the right coronary artery. Moreover, the probation report also states that, after the attack, Mr. Palacios drove away from the scene with his crime partners, leaving Mr. Angulo—who was still alive at the time—there. Mr. Palacios committed an especially cruel second-degree murder and this factor alone is enough for me to conclude presently that his release from prison would pose an unreasonable public-safety risk.

Mr. Palacios has been in prison a long time and has made creditable gains over the years, including claiming responsibility and remorsefulness for Mr. Angulo's murder. But after carefully considering the very same factors the Board is required to consider, I find the gravity of the second-degree murder committed by Mr. Palacios presently outweighs the positive factors supporting his parole suitability. Accordingly, because I believe his release from prison would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2005 decision to grant parole to Mr. Palacios.

Decision Date: 12|19|05

ARNOLD SCHWARZENEGGER
Governor, State of California

EXHIBIT 8

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### DEPT 100

| | | |
|---|---|---|
| Date: JUNE 22, 2007 | Judge J. PULIDO | Deputy Clerk |
| Honorable: STEVEN R. VAN SICKLEN | Bailiff NONE | Reporter |
| NONE | | |

(Parties and Counsel checked if present)

BH003908
In re,
EDWARD PALACIOS,
      Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's writ of habeas corpus filed on March 3, 2006, as well as the return and traverse filed in response to the Court's order to show cause. Having independently reviewed the record, giving deference to the broad discretion of the Governor in parole matters, the Court concludes that the record contains "some evidence" to support the Governor's finding that petitioner is unsuitable for parole (Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on March 31, 1986 after a conviction for one count of second-degree murder. He was sentenced to fifteen years to life. His minimum parole eligibility date was February 19, 1995. The record reflects that on September 2, 1985, petitioner and two other members of the Little Watts street gang went to Lennox Park to look for members of a rival gang. They encountered the victim, who was with his girlfriend, and asked where he was from. After a verbal confrontation, petitioner and his crime partners exited their vehicle and began fighting with the victim. Petitioner's crime partners beat him with baseball bats. Then, petitioner pulled out a knife and stabbed the victim several times in the torso. The victim died seven days later from a stab wound to the heart, which had severed his right coronary artery.

The Governor is constitutionally authorized to make "an independent decision" as to parole suitability. (*Rosenkrantz, supra,* 29 Cal.4th 616, 670.) Only a "modicum of evidence" is required. (*Id.* at 677.) Here, the Governor reversed the Board of Prison Term's (hereafter "Board") decision to grant petitioner parole because he concluded the gravity of the murder he committed currently outweighs the positive factors supporting his parole suitability.

The Governor can properly rely solely upon the circumstances of the crime in deciding that petitioner is not presently suitable for parole. (*Rosenkrantz, supra,* 29 Cal.4th 616, 683; *In re Van Houten* (2004) 116 Cal.App.4th 339, 358-359.) The Court finds that there is some evidence to support the Governor's finding that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D).) Callous disregard for human suffering is demonstrated when "death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim." (*In re Scott* (2004) 119 Cal.App.4th 871, 891) Here, the victim, who was outnumbered three to one, was beaten or clubbed with baseball bats by

1

Minutes Entered
06-22-07
County Clerk

## *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| | | |
|---|---|---|
| Date: | JUNE 22, 2007 | |
| Honorable: STEVEN R. VAN SICKLEN | Judge J. PULIDO | Deputy Clerk |
| NONE | Bailiff NONE | Reporter |

(Parties and Counsel checked if present)

BH003908
In re,
EDWARD PALACIOS,
       Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

petitioner's crime partner before he was stabbed multiple times by petitioner. These multiple wounds inflicted with a knife did not cause immediate death. Rather, the victim, whom petitioner left bleeding on the ground, died a week later in the hospital. There is some evidence to support the Governor's conclusion that this murder demonstrated an exceptionally callous disregard for human suffering.

The Court finds that there is some evidence to support the Governor's finding that "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*Scott, supra*, 119 Cal.App.4th 871, at 893). The motive in this case was gang retaliation. The Governor was justified in determining that this motive is materially less significant than those which conventionally drive people to commit murder, indicating that petitioner is more of a risk of danger to society if released.

Accordingly, the petition is denied.

The clerk is directed to give notice to petitioner and the Office of the Attorney General.

The court order is signed and filed this date.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Law Offices of Jeffrey A. Lowe
Jeffrey A. Lowe, Esq.
8383 Wilshire Boulevard, Suite 652
Beverly Hills, California 90211
Attorney for Petitioner Edward Palacios

Department of Justice
Office of the Attorney General of the State of
California
110 West A Street, Suite 1100
San Diego, California 92101
Attn.: Cynthia Lumely

2

| Minutes Entered |
|---|
| 06-22-07 |
| County Clerk |

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | CONFORMED COPY<br>JUL 1 3 2007<br>LOS ANGELES<br>SUPERIOR COURT<br>*Joseph M. Pulido*<br>Joseph M. Pulido |
| PLAINTIFF/PETITIONER<br><br>EDWARD PALACIOS | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER<br><br>BH003908 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- [ ] Order Extending Time
- [ ] Order to Show Cause
- [ ] Order for Informal Response
- [ ] Order for Supplemental Pleading

- [✓] Order re: Writ of Habeas Corpus
- [ ] Order
- [ ] Order re:
- [ ] Copy of Petition for Writ of Habeas Corpus for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

July 13, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: *Joseph M. Pulido* , Clerk
Joseph M. Pulido

Law Offices of Jeffrey A. Lowe
Jeffrey A. Lowe, Esq.
8383 Wilshire Boulevard, Suite 652
Beverly Hills, California 90211
Attorney for Petitioner Edward Palacios

Department of Justice
Office of the Attorney General of the State of California
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

EXHIBIT 9

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re EDWARD PALACIOS, | B201799 |
| On Habeas Corpus. | (Super. Ct. No. A772728) |
| | **ORDER** |

THE COURT:

The court has read and considered the petition for writ of habeas corpus filed September 5, 2007. The petition is summarily denied.

COURT OF APPEAL - SECOND DIST.

FILED

SEP 1 3 2007

JOSEPH A. LANE          Clerk

J. GUZMAN                Deputy Clerk

BOREN, P. J.          ASHMANN-GERST, J.          CHAVEZ, J.

EXHIBIT 10

S160422

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re EDWARD PALACIOS on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

MAR 1 9 2008

Frederick K. Ohlrich Clerk

_____
Deputy

_____
GEORGE
Chief Justice